997 A.2d 144

**Dameek YEARBY a/k/a Dameek Yerby**

v.

**STATE of Maryland.**

**No. 119, Sept. Term, 2009.**

Court of Appeals of Maryland.

June 17, 2010.

**710**

Kellie M. Black, Asst. Public Defender (Paul B. DeWolfe, Public Defender, of Baltimore, MD), on brief, for petitioner.

Diane E. Keller, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, of Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BATTAGLIA, J.

The Petitioner, Dameek Yearby,[1] was convicted of robbery, second degree assault, and theft of goods with a value less than $500, in a jury trial in the Circuit Court for Baltimore City. After his motion for new trial was denied, and sentence imposed, he appealed to the Court of Special Appeals. In an unreported opinion, the intermediate appellate court affirmed the judgments in all respects.

Yearby then filed a petition for certiorari in this Court. We granted his petition to consider the following question:

Did the State commit a *Brady*[2] violation by failing to disclose the facts that the police had developed other suspects with respect to a series of robberies that happened in the same area and during the same time frame as the robbery of which Petitioner was accused, and that at least one of those suspects resembled Petitioner?

*Yearby v. State,* 411 Md. 355, 983 A.2d 431 (2009). We shall answer "No" to the question, and consequently, shall affirm.

**FACTS AND PROCEDURAL HISTORY**

On the night of November 8, 2004, Camille Zongo, a student at Morgan State University in Baltimore, was robbed at gunpoint on campus. After surrendering money to the robber, she began walking toward her dormitory. The gunman ordered her to turn around and walk in the opposite direction.

---

**1.** The Petitioner's surname has at least two spellings in the record, but for the remainder of this opinion, we shall adopt the spelling "Yearby," as he does in his brief.

**2.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The reference to *Brady* concerns "[i]nformation or evidence that is favorable to a criminal defendant's case and that the prosecution has a duty to disclose." Black's Law Dictionary 212 (9th ed. 2009).

As she turned around toward him, Ms. Zongo could see her assailant because the area was well-lit.[3] She later described him as a black male, with a "low haircut" and a caramel complexion, about 5'7" to 5'8" tall, and wearing a white shirt.

In late 2004, there had been a series of other armed robberies in and around the Morgan State campus—at least fourteen had been reported to police. Detective James B. Harrison of the Morgan State University Police Department was assigned the duty to investigate; in the course of his investigation, Yearby, who also was a student at Morgan State, filed a complaint with campus police claiming he had been assaulted. Harrison's suspicions heightened when, shortly afterward, Yearby's roommate, Daryl Gates, was the victim of a more serious assault. There were rumors about campus that Yearby and Gates had been responsible for the robbery spree and that those suspicions had fueled the assaults against Yearby and Gates.

Detective Harrison came to suspect Yearby in the robbery against Ms. Zongo and decided to prepare a photo array that included Yearby's college photo ID. Ms. Zongo selected Yearby's photo from the array, telling Harrison she was "positive" he was the robber. After obtaining an arrest warrant, Detective Harrison, while interviewing Yearby, ostensibly concerning the assault against him, instead, arrested Yearby.

Yearby was charged with robbery with a dangerous weapon; robbery; first degree assault; second degree assault; theft of goods with value less than $500; wearing, carrying, or transporting a handgun; and use of a handgun during the commission of a felony or crime of violence.[4]

---

3. In fact, Ms. Zongo's uncontroverted testimony was that she "could pretty much make out what this individual looked like because it was a light right on top of us."

4. Around the same time, Yearby was charged, in two different cases, with armed robbery and related charges involving separate crimes that occurred on November 16, 2004, against a different victim. The latter charges were stetted. Yearby also contends, in support of his *Brady* violation assertion, that the co-defendant in those cases, Michael Camp-

Yearby filed a motion to suppress Ms. Zongo's pretrial identification. Detective Harrison testified at the hearing on that motion, setting forth the background surrounding the case, and the reasons his investigation focused on Yearby as the perpetrator of the armed robbery. Defense counsel questioned him about whether there were other suspects in the case:

[DEFENSE COUNSEL]: Now, these—when you put together this photo array, did you ever consult with Baltimore City Police Department for possible persons of interest?

[DETECTIVE HARRISON]: Yes.

[DEFENSE COUNSEL]: And did you come up with any information from Baltimore City as to possible suspects?

[DETECTIVE HARRISON]: No.

[DEFENSE COUNSEL]: No?

[DETECTIVE HARRISON]: No. Not at that time.

[DEFENSE COUNSEL]: And did you have other possible suspects during the investigation before you did the photo array?

[DETECTIVE HARRISON]: Like I said, there was—there was—I believe they had within that time, during that time, they've had, like, fourteen armed robberies at that time, so it was just—

[DEFENSE COUNSEL]: My question is, did you have other suspects?

[DETECTIVE HARRISON]: Yes, I did.

[DEFENSE COUNSEL]: And did you put any of those other suspects in the photo array?

[DETECTIVE HARRISON]: Yes, I did.

[DEFENSE COUNSEL]: Okay. And can you identify which of these photos were the other suspects?

---

bell, had been implicated, along with another subject who "look[ed] just like" Yearby, in yet another robbery that took place around the same time, that did not involve Yearby. The record is devoid of any information in support of this assertion, however.

[DETECTIVE HARRISON]: Not at that time, there wasn't.

[DEFENSE COUNSEL]: I'm sorry?

[DETECTIVE HARRISON]: I didn't put any of them in that photo array.

[DEFENSE COUNSEL]: Well, what photo array did you put them in?

[DETECTIVE HARRISON]: Another photo array [that I did not show to Ms. Zongo].

\*　　\*　　\*

[DETECTIVE HARRISON]: Okay. What happened was, there were fourteen armed robberies in the area at that time. So quite naturally I have a number of different suspects, but what I did is, they were subsequently identified by other students and I did put a photo array involving Mr. Yearby's picture. The one that I showed her, since it did state that he was a light-skinned male, I showed her his picture and that [was] the only photo array that I showed her.

The court denied Yearby's motion to suppress, and Ms. Zongo's pretrial identification subsequently was admitted at trial.

Voir dire and jury selection took place the following day, and trial began on May 9, 2007. Ms. Zongo testified that Yearby was her assailant, and later authenticated her extrajudicial identification in front of the jury. Detective Harrison also testified, corroborating Ms. Zongo's testimony.

During re-cross examination of Harrison, the defense pressed him about "the other suspects that [he] developed not matching ... Yearby's description." Counsel then asked whether Harrison had provided any of his reports concerning the other robberies that had been under investigation at the same time he was investigating this case. Harrison answered "No," and when defense counsel persisted in this line of questioning, the prosecutor objected. A bench conference then ensued:

[PROSECUTOR]: [The defense] does have some of that information. (Inaudible) second case, has the information. Defense has it.

[DEFENSE COUNSEL]: (Inaudible) fourteen armed robberies.

THE COURT: I didn't hear you.

[DEFENSE COUNSEL]: There's fourteen armed robberies. He hasn't said how many other people there are. I have no idea.

[PROSECUTOR]: And [defense counsel] did her own investigation and put another suspect, who was also one of those suspects, and showed it—

[DEFENSE COUNSEL]: *And looks just like my guy.* If she wants to go down that road, we can do it.

\* \* \*

THE COURT: Let's just end it here ...

(Emphasis added.)

The jury convicted Yearby of robbery, second degree assault, and theft of goods with value less than $500, and acquitted him of the remaining charges.

Yearby filed a timely motion for new trial, asserting that the State had violated *Brady* by failing to disclose that Detective Harrison "had developed additional suspects at the time he administered the photographic line-up to Ms. Zongo," that the prosecutor's closing argument had been "loaded with improper remarks," that the trial court erroneously had denied a defense motion for mistrial and further had refused to give a curative instruction to correct repeated attempts by the prosecutor to introduce hearsay, and that the evidence was insufficient. After a hearing, the court denied Yearby's motion. Yearby was sentenced to six years' imprisonment, suspended to time already served, with three years' probation.

Yearby appealed to the Court of Special Appeals, claiming that the trial court had erred in denying his motion for new trial because the State had violated *Brady*. He also contended in the intermediate appellate court that the trial judge had

committed plain error by failing to take any curative action in response to the prosecutor's "multiple improper comments" during closing argument.

The intermediate appellate court affirmed the judgments of the trial court in an unreported opinion. Yearby filed a petition for certiorari, limited to the *Brady* issue, which we granted.

## INTRODUCTION

The Supreme Court held in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963), that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The Court subsequently has refined and elaborated on this holding, extending the categories of evidence that must be disclosed, *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 108 (1972) (impeachment evidence), and, when evidence is "highly probative of innocence," relieving the accused of the burden of making a request. *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342, 353 (1976); *Wilson v. State*, 363 Md. 333, 346, 768 A.2d 675, 682 (2001); *see also Diallo v. State*, 413 Md. 678, 706–08, 994 A.2d 820, 837–38 (2010) (discussing a prosecutor's duty to discover and disclose exculpatory evidence known to other state actors).

There are, however, limits to the prosecutor's automatic duty of disclosure. *See United States v. Bagley*, 473 U.S. 667, 675 n. 7, 105 S.Ct. 3375, 3380 n. 7, 87 L.Ed.2d 481, 489 n. 7 (1985) ("An interpretation of *Brady* to create a broad, constitutionally required right of discovery 'would entirely alter the character and balance of our present systems of criminal justice.'") (quoting *Giles v. Maryland*, 386 U.S. 66, 117, 87 S.Ct. 793, 819, 17 L.Ed.2d 737, 769 (1967)) (Harlan, J., dissenting). As the Supreme Court has explained, "a rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, *no matter how insignificant*, would

impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments." *Bagley,* 473 U.S. at 675 n. 7, 105 S.Ct. at 3380 n. 7, 87 L.Ed.2d at 489 n. 7.

■ The results of these refinements can be distilled into the following formulation:

> There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286, 302 (1999); *see also Harris v. State,* 407 Md. 503, 521, 966 A.2d 925, 935 (2009) (noting that, in the context of a *Brady* claim, evidence "favorable to the defense" includes mitigation evidence); *accord State v. Williams,* 392 Md. 194, 199, 896 A.2d 973, 975–76 (2006); *Ware v. State,* 348 Md. 19, 38, 702 A.2d 699, 708 (1997).

■ The prejudice prong is closely related to the question of materiality. *Banks v. Dretke,* 540 U.S. 668, 698–99, 124 S.Ct. 1256, 1276, 157 L.Ed.2d 1166, 1194–95 (2004). The standard is whether there is a *"reasonable probability "* that disclosure of the suppressed evidence would have led to a different result.[5] *Kyles v. Whitley,* 514 U.S. 419, 434, 115

---

**5.** The Supreme Court has applied a different rule in cases where "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342, 349 (1976). In such cases, the materiality standard is stricter (against the State). *Id.* at 104, 96 S.Ct. at 2397, 49 L.Ed.2d at 350; *see also Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 108 (1972) ("A new trial is required if 'the false testimony could ... *in any reasonable likelihood have affected the judgment of the jury ....*' ") (quoting *Napue v. Illinois,* 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217, 1222 (1959)) (emphasis added). In *Harris v. State,* 407 Md. 503, 522, 966 A.2d 925, 936 (2009), we reaffirmed the existence of a different materiality standard in cases where "the facts demonstrate that the prosecution's case included perjured testimony and that the prosecution knew or should have known of the perjury." *See also State v. Williams,* 392 Md.

S.Ct. 1555, 1566, 131 L.Ed.2d 490, 506 (1995) (emphasis added). "A 'reasonable probability' of a different result is ... shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.*, quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381, 87 L.Ed.2d at 491. *Accord Strickler*, 527 U.S. at 281, 119 S.Ct. at 1948, 144 L.Ed.2d at 302 ("[S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.").

The Supreme Court has further explicated the materiality standard, explaining that it is essentially the same test as set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in determining whether a defendant has been prejudiced by a constitutional violation affecting his right to a fair trial.[6] *Bagley*, 473 U.S. at 682, 105 S.Ct. at

---

194, 203 n. 4, 229 n. 12, 896 A.2d 973, 978 n. 4, 993 n. 12 (2006); *Grandison v. State*, 390 Md. 412, 431, 889 A.2d 366, 377 (2005); *Conyers v. State*, 367 Md. 571, 598, 790 A.2d 15, 31 (2002).

**6.** In *Strickland*, the constitutional right at issue was the Sixth Amendment right to the effective assistance of counsel. In that context, the Court explicitly tied prejudice to materiality, and cited *Agurs*, a case addressing materiality of *Brady* evidence. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1984) ("Accordingly, the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, *United States v. Agurs*, 427 U.S., at 104, 112–113 [96 S.Ct. 2392], and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness, *United States v. Valenzuela–Bernal*, [458 U.S. 858], at 872–874 [102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982)].").

Consequently, to prevail on a *Strickland* claim, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. The Court defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* The "reasonable probability" standard is the same as that applied in *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490, 506 (1995), and *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985) (Blackmun, J., plurality), cases involving the materiality of *Brady* evidence.

3383, 87 L.Ed.2d at 494 (Blackmun, J., plurality). *See also* 6 Wayne R. LaFave, *et al., Criminal Procedure* § 24.3(b), at 350–53 (3d ed. 2007). Our own cases have said that evidence is material if there is a *"substantial possibility* that, had the [evidence] been revealed to [defense] counsel, the result of his trial would have been any different."[7] *State v. Thomas,* 325 Md. 160, 190, 599 A.2d 1171, 1185 (1992) (emphasis added) (footnote omitted); *Bowers v. State,* 320 Md. 416, 426–27, 578 A.2d 734, 738–39 (1990). *Accord Grandison v. State,* 390 Md. 412, 432 n. 4, 889 A.2d 366, 377 n. 4 (2005).

 An alleged *Brady* violation is a constitutional claim, based on the Due Process Clauses of the Fifth and Fourteenth Amendments. *Agurs,* 427 U.S. at 107, 96 S.Ct. at 2399, 49 L.Ed.2d at 352 ("We are not considering the scope of discovery authorized by the Federal Rules of Criminal Procedure, or the wisdom of amending those Rules.... We are dealing with

---

**7.** In *State v. Williams,* 392 Md. at 203 n. 4, 229 n. 12, 896 A.2d at 978 n. 4, 993 n. 12, we used language suggesting that the correct standard in assessing *Brady* materiality was whether there was a "reasonable *possibility* " that, if the suppressed evidence had been disclosed, the verdict would have been different, citing *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976). *Dorsey* concerned the application of the harmless error standard of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710–11 (1967), in a criminal case. We thus applied a harmless error standard in *Williams,* because we analogized the facts of that case to *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104, in which the Supreme Court applied the same standard.

In *Williams,* a State witness arguably had perjured himself, even though the prosecutor trying the case was unaware of the falsity of the testimony. 392 Md. at 199–201, 896 A.2d at 976–77. Thus, that case fell under the stricter rule of *Giglio, Napue,* and *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), rather than the general rule of "reasonable probability." *See* 6 Wayne R. LaFave, *et al., Criminal Procedure* § 24.3(b), at 350–53 (3d ed. 2007); *id.* § 24.3(d), at 376–81; *see also* 2 Nancy Hollander, *et al., Wharton's Criminal Procedure* § 12:41, at 12–329-330 & n. 5 (14th ed. 2009).

Not surprisingly, Yearby in his brief latches onto the "reasonable possibility" language we used in *Williams,* but his reliance on that language is misplaced. The present case does not involve perjured testimony or the prosecution's failure to notify the court when it should have been aware of the presentation of false evidence, and, consequently, the strict materiality standard of *Williams* (*i.e.,* the harmless error standard) does not apply.

the defendant's right to a fair trial mandated by the Due Process Clause of the Fifth [and Fourteenth] Amendment[s] to the Constitution."); *id.* at 110, 96 S.Ct. at 2400, 49 L.Ed.2d at 353 (discussing the determination of "'materiality' in the constitutional sense" and delineating "the constitutional obligation" of the prosecutor); *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218 ("the suppression by the prosecution of evidence favorable to an accused upon request *violates due process* ") (emphasis added); *Harris*, 407 Md. at 521, 966 A.2d at 935; 6 LaFave, § 24.3(a), at 339–43 (explaining that *Brady* claims have been analyzed under due process rather than as violations of the Confrontation Clause). *Brady* disclosure thus is fundamentally distinct from discovery rules, which further spell out the State's (and to a lesser extent, the defendant's) obligations to disclose information prior to trial, but are not grounded in either the Federal or State Constitution.[8]

■ It bears repeating that the burdens of production and persuasion regarding a *Brady* violation fall on the defendant. *Diallo*, 413 Md. at 704, 994 A.2d at 835 ("To establish a *Brady* violation, *Petitioner* must establish …") (emphasis added); *accord Harris*, 407 Md. at 521, 966 A.2d at 935; *Grandison*, 390 Md. at 431, 889 A.2d at 377; *Ware*, 348 Md. at 38, 702 A.2d at 708.

---

**8.** We note that, in Maryland, discovery in criminal trials is governed by Maryland Rule 4–263, but that the Rule's disclosure obligations, to the extent they exceed due process requirements, are not of a constitutional nature. *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30, 42 (1977). At the time of Yearby's trial, Rule 4–263(a)(1) (2007) required the State to disclose *Brady* material without a defense request ("Without the necessity of a request, the State's Attorney shall furnish to the defendant … [a]ny material or information tending to negate or mitigate the guilt or punishment of the defendant as to the offense charged[.]"), whereas disclosure of other information was predicated on a defense request, Rule 4–263(b), or was not subject to discovery by the defendant. Rule 4–263(c). Rule 4–263 thus governed (and in its present version, still governs) all disclosure of evidence by the State to a criminal defendant in the circuit courts, including that mandated by *Brady*, as well as that mandated only by rule.

## DISCUSSION

Yearby asserts that the State was obligated under *Brady* "to disclose the fact that the police had developed other suspects." According to Yearby, his own investigation revealed that "there was another male who is similar in appearance" to him who was "caught red handed in the act of robbing people" with Yearby's co-defendant in another robbery case, which ultimately was stetted. He insists that the State was required to disclose information he requested,[9] concerning these "other suspects" in other robberies, apparently under the theory that the same perpetrator in at least some of the other robberies may also have committed the robbery of Ms. Zongo.

---

9. The extent of Yearby's requests is unclear. On March 4, 2005, more than two years before trial, he filed a Request for Discovery and Inspection, wishing "to obtain disclosure of material and information to the fullest extent authorized and directed by Maryland Rule 4–263." During the suppression hearing, and later during trial, he expressed apparent dissatisfaction with the State's disclosures, but never filed a motion to compel discovery.

In his motion for new trial, Yearby asserted that "Detective Harrison initially testified [at the suppression hearing] that he **did not** have any other suspects **for this particular crime** at the time he conducted the photo line-up," but "then changed his testimony and said he did have other suspects before the photo line-up was administered, but that he **did not** include photographs of any suspects" in the line-up shown to Ms. Zongo. According to Yearby, "the State **never** produced any material or information ... of any other possible suspects in this case." At trial, according to Yearby, Detective Harrison "testified that he had developed additional suspects for this crime" prior to administering the photo line-up, but that "he did not include any photographs of these suspects in the photo line-up shown to Ms. Zongo."

Detective Harrison's actual testimony at the suppression hearing was that the "other suspects" had been implicated in other crimes that had occurred in late 2004, but not in the robbery of Ms. Zongo. At trial, under re-direct examination, he testified that the other suspects did not match the description given by Ms. Zongo. We note that the trial transcript was not yet available when Yearby filed the motion for new trial.

During the hearing on the motion for new trial, Yearby proffered that "I did ask the State to still provide [information regarding the other suspects] after the trial was over." The record is devoid of any documents reflecting such a request.

Yearby contends that he has satisfied all three prongs of the *Brady* analysis: that the prosecutor withheld evidence, which in turn was favorable to him, and that the withheld evidence was material. Consequently, he maintains that the State's "refus[al]" to disclose the requested information denied him due process of law, that the trial court erred in denying his motion for new trial, and that the Court of Special Appeals erred in affirming the trial court.

The State counters that Yearby failed to satisfy any of the *Brady* requirements, and that we must therefore affirm the judgment. According to the State, the information it allegedly failed to disclose did not fall within the scope of its *Brady* obligation, and that, in any event, the information was irrelevant to *this* case and therefore was immaterial. The State further argues that "the information Yearby claims was withheld was actually known to the defense during trial, if not before, or readily accessible to [him] through reasonable investigation." We agree with the State as to the latter argument, and therefore do not reach the issues of materiality, or whether the disputed evidence was exculpatory to Yearby.

**Whether the Prosecution Withheld Evidence**

Prosecutorial suppression of evidence is a predicate to a *Brady* claim. Indeed, as the intermediate appellate court explained in its unreported opinion in the present case, "[w]ith regard to suppression of evidence, *Brady* deals with the issue of withholding the knowledge from the jury, right through to the close of trial." *See, e.g., Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397, 49 L.Ed.2d at 349 ("The rule of *Brady* . . . arguably applies in three quite different situations. Each involves the *discovery, after trial, of information which had been known to the prosecution but unknown to the defense.*") (emphasis added); *Conyers v. State,* 367 Md. 571, 601, 790 A.2d 15, 33 (2002) (explaining that evidence is "suppressed within the meaning of *Brady* if it is 'information which had been known to the prosecution but unknown to the defense' "), quoting *Spicer v. Roxbury Corr. Inst.,* 194 F.3d 547, 557 (4th Cir.1999) (internal quotation omitted). Thus, suppression is inextricably

intertwined with the timing of disclosure [10] and the defendant's independent duty to investigate, especially in a situation where the defense "was aware of the potentially exculpatory nature of the evidence as well as its existence." 6 LaFave, § 24.3(b), at 362.

We previously have explained that, under *Brady* and its progeny, the defense is not relieved of its "obligation to investigate the case and prepare for trial." *Ware*, 348 Md. at 39, 702 A.2d at 708. *See Bagley*, 473 U.S. at 675, 105 S.Ct. at 3379–80, 87 L.Ed.2d at 489 (noting that *Brady's* "purpose is not to displace the adversary system as the primary means by which truth is uncovered, ... [and] [t]hus, the prosecutor is not required to deliver his entire file to defense counsel[.]"). Moreover, "[t]he prosecution cannot be said to have suppressed evidence for *Brady* purposes when the information allegedly suppressed was available to the defendant through reasonable and diligent investigation." *Ware*, 348 Md. at 39, 702 A.2d at 708. Finally, *Brady* "offers a defendant *no relief when the defendant knew or should have known facts permitting him or her to take advantage of the evidence in question or when a reasonable defendant would have found the evidence.*" *Id.* (emphasis added). *See, e.g., Hoke v. Netherland,*

---

**10.** Although as a general rule, *Brady* issues crystalize after the conclusion of trial, and indeed, often in the context of collateral attacks on criminal verdicts, *see, e.g., Harris v. State*, 407 Md. 503, 506, 966 A.2d 925, 926–27 (2009) (post conviction proceeding); *Williams*, 392 Md. at 202, 896 A.2d at 977 (same); *Grandison*, 390 Md. 412, 889 A.2d 366 *(fifth* appeal from conviction); *State v. Thomas*, 325 Md. 160, 599 A.2d 1171 (1992) (post conviction proceeding); *Bowers v. State*, 320 Md. 416, 578 A.2d 734 (1990) (same), we hasten to add that this is not a hard-and-fast requirement. *See, e.g., Diallo v. State*, 413 Md. 678, 994 A.2d 820 (2010) (issue raised by pre-trial motion, and addressed in direct appeal); *Ware v. State*, 348 Md. 19, 702 A.2d 699 (1997) (direct appeal in capital case). Even in *Ware*, however, a case in which we determined there was a *Brady* violation, the defendant was unaware of the exculpatory evidence until two months after his conviction. *Id.* at 34, 702 A.2d at 706. The critical point is that the prosecutor's duty to disclose arises prior to trial, whereas the defendant's knowledge of a violation, should there be any, usually does not become clear until after the conclusion of trial. The timing of *Brady* disclosure is not an issue in the present case, however.

92 F.3d 1350, 1355–56 (4th Cir.1996) (holding that defendant's *Brady* claim failed because his counsel had failed to undertake a "reasonable and diligent" investigation which probably would have revealed the allegedly government-suppressed information); *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir. 1990) (noting that " 'the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources.' ") (quoting *United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir.1986)); *cf. McCleskey v. Zant*, 499 U.S. 467, 498, 111 S.Ct. 1454, 1472, 113 L.Ed.2d 517, 547 (1991) (noting, in a federal habeas action, that a "petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief ... [and if] what petitioner knows or could discover upon reasonable investigation supports a claim for relief ..., what he does not know is irrelevant."); *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir.1995) ("Documents that are part of public records are not deemed suppressed if defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation.").

If the defendant has actual or constructive knowledge of the allegedly withheld exculpatory information, there cannot be a *Brady* violation. "[T]he necessary inquiry is whether the defendant knew or should have known facts that would have allowed him to access the undisclosed evidence." *Ware*, 348 Md. at 39, 702 A.2d at 709. The defendant's constructive knowledge is assessed under a reasonable person standard. *Id.* (noting that State is not relieved of its *Brady* obligation "unless a reasonable defendant would have looked to that public record in the exercise of due diligence").

We also recently have explained that "[n]either the prosecutor's negligence, willfulness, [n]or lack of bad faith in failing to produce exculpatory or impeachment information bears on our consideration of whether the defendant's right to due process was violated under *Brady*." *Diallo v. State*, 413 Md. at 705, 994 A.2d at 836. In *Diallo*, we addressed a *Brady* claim by the son of a United Nations official. The petitioner in *Diallo*

asserted that the U.S. State Department, an alleged "agent" of the prosecutor in Maryland, "had actual knowledge that [Diallo] was entitled to diplomatic immunity and that it chose not to convey this information to the prosecutor." *Id.* at 704, 994 A.2d at 835. In determining there had been no *Brady* violation, we explained that all the evidence allegedly suppressed either "was known to [Diallo] or he was in a unique position to obtain." *Id.* at 706, 994 A.2d at 836.

Applying these principles to the instant case, we hold that "[t]he rule of *Brady* " is inapplicable. Defense counsel cross-examined Detective Harrison about other possible suspects, both during the pre-trial suppression hearing and at trial. From the suppression hearing transcript, we can glean that Yearby knew, prior to trial, that Detective Harrison had been investigating fourteen robberies that had taken place in late 2004 in or near the Morgan State campus, and that he had "a number of different suspects." From the trial transcript, in particular the bench conference that took place during re-cross examination of Detective Harrison, it is clear that Yearby further knew of at least one alleged suspect who "look[ed] just like" him. Later, during the hearing on the motion for new trial, Yearby admitted that "during and after trial," he found out "on [his] own" that Detective Harrison "was aware one or two days before he ever showed these photo arrays to Ms. Zongo, that there was another male who is similar in appearance to ... Yearby who was caught red handed in the act robbing people with [Campbell]." From this premise, Yearby speculated that Detective Harrison "had to be" considering this other, unnamed suspect in the robbery of Ms. Zongo. Detective Harrison testified, however, that Yearby was the only suspect he ever considered in this case.

Yearby had information before, during, and after trial regarding the other suspects identified in connection with the series of robberies at Morgan State in 2004 and was able to cross-examine Detective Harrison, the lead investigator, about whether there could be or were other subjects. He further knew of at least one other subject who "look[ed] just like" him. As in *Diallo,* " '[t]here can be no Brady violation where there

is no suppression of evidence.' " 413 Md. at 706, 994 A.2d at 836, quoting *Diallo v. State,* 186 Md.App. 22, 73–74, 972 A.2d 917, 947 (2009).

Although this case is unlike *Diallo* in that the petitioner there was "in a unique position to obtain" at least some of the alleged *Brady* material, here Yearby also knew of the allegedly suppressed material. We hold that there was no *Brady* violation in the present case.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE PETITIONER.**