*Jose O. Canales-Yanez v. State of Maryland*, No. 2209, September Term 2018.  Opinion by Beachley, J.

## *BRADY* VIOLATION—MATERIALITY

After a non-jury trial, defendant was convicted of first-degree murder, conspiracy to commit murder, and other related offenses.  Defendant moved for a new trial on the basis that the State failed to provide the recording and transcript of a police interview of the parents of a State's witness prior to trial.  The witness spoke with police the day after the undisclosed interview with her parents and changed her version of events from what she had previously told police.  Defendant alleged that failure to disclose the interview was a *Brady* violation.

The judge who presided over the trial denied the motion, stating that even if the witness's testimony were completely removed from the trial, there was still sufficient evidence to convict the defendant.  The defendant appealed.

*Held*: Judgment affirmed.  Accepting that the interview was favorable to the defendant and had been withheld by the State, the evidence was nonetheless not material as it would not have affected the outcome of the case.  When a case is tried without a jury and the trial judge is the one ruling on a motion for new trial, the trial judge's finding that the evidence was not material should only be set aside if it is patently unreasonable.

Circuit Court for Montgomery County
Case No. 132902C

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2209

September Term, 2018

JOSE CANALES-YANEZ

v.

STATE OF MARYLAND

Fader, C.J.,
Beachley,
Kenney, James A., III
   (Senior Judge, Specially Assigned),

JJ.

Opinion by Beachley, J.

Filed: January 29, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Following a bench trial in the Circuit Court for Montgomery County, the court convicted Jose O. Canales-Yanez, appellant, of two counts of first-degree murder, conspiracy to commit murder, and other related offenses. Before sentencing, the State revealed a previously undisclosed recording and transcript of a police interview of the parents of one of the State's key witnesses. Appellant filed a motion for new trial, alleging that the State's failure to disclose the interview constituted a *Brady*[1] violation. The court denied the motion.

Appellant presents the following question on appeal, which we have slightly modified:

> Did the circuit court err in denying a new trial based on a *Brady* violation stemming from the State's failure to disclose a police interview of the mother and stepfather of one of the State's principal witnesses?[2]

For the reasons to follow, we shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 5, 2017, the night before their high school graduation, Shadi Najjar and Artem Zibrov were shot and killed. The two were gunned down at approximately 10:30 p.m. while sitting in Shadi's car in Gallery Court, a cul-de-sac in Montgomery Village, Maryland. Police arrested four individuals suspected of conspiring to commit

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

[2] Appellant presented the following question in his brief: "Did the circuit court err in denying a new trial based on the *Brady* violation stemming from the State's failure to disclose the police interview of the mother and stepfather of Victoria Kuria, the State's principal witness, that occurred the day before Ms. Kuria, for the first time, implicated Appellant to the police?"

these murders: Roger Garcia, Edgar Garcia-Gaona, Rony Galicia, and appellant.

**Ms. Kuria's First Interview**

Victoria Kuria was dating Roger Garcia, one of the suspects, at the time of the murders. Detective Frank Springer interviewed Ms. Kuria on June 29, 2017. During that interview, she stated that she knew nothing about the murders, but that she was at Roger's home the night the murders took place. In that interview, Ms. Kuria gave the following version of events: After she left work that day, she went to her parents' house, picked up her dog, and then went to Roger's house. Present at Roger's house when she arrived were Roger, Roger's father, and a friend of Roger's known as "Joker." After smoking marijuana, Ms. Kuria napped in Roger's bedroom from approximately 9:30 to 10:20 p.m. When she woke up, Roger was still in the bedroom. She left shortly after waking up, to return home before her midnight curfew. When asked about appellant, she told police that she had "seen him before," but did not know him well.

Detective Springer told Ms. Kuria that he did not believe that she was being truthful. He emphasized multiple times that it was a crime to lie to the police, and suggested that Ms. Kuria take a polygraph test. Ms. Kuria refused the polygraph and asked to speak with a lawyer. This concluded Ms. Kuria's first interaction with the police.

**The Undisclosed Interview with Ms. Kuria's Parents**

On October 10, 2017, Detective Springer and Detective Gwynn[3] visited the home of Ms. and Mr. Bell, Ms. Kuria's mother and step-father, hoping to contact Ms. Kuria.

---

[3] Detective Gwynn's first name does not appear in the record.

When Detective Springer stated that the police were investigating the murders, Mr. Bell said, "[Ms. Kuria] knows about that, she knows about that. She said she knew who did it, don't you remember?" In response, Ms. Bell stated that Ms. Kuria told her she did not know who committed the murders. A short argument between the two followed, without further details being elicited.

The detectives then made it clear that they believed Ms. Kuria had lied in her first interview with police. They emphasized that Ms. Kuria could be prosecuted for lying to the police, stating, "when you have information in a case and you lie to the police about it, that can turn into a crime for you." The detectives also explained that they were not looking for Ms. Kuria to arrest her for making false statements, but to "give her a second chance" to "tell the truth." Detective Springer said, "She's not in trouble, the problem is, because she's lied to us and we can prove it now, that could be an issue for her and I'm trying to make it so that it's not an issue for her. . . . But in order for that to happen, I need her to come in and talk to me and tell me the truth."

Notably, the State did not provide the recording and transcript of this interview to defense counsel prior to trial. This omission became the basis for appellant's *Brady* claim and the focus of this appeal.

### Ms. Kuria's Second Interview

On October 11, 2017, the day after the undisclosed interview, Detective Springer again interviewed Ms. Kuria. This time, Ms. Kuria told the detectives that she arrived at Roger's house with her dog, smoked marijuana, and fell asleep in Roger's bedroom at approximately 7:00 p.m. When she went to sleep, Roger, his brother Edgar, Joker, and a

3

large Hispanic man she did not recognize were in Roger's bedroom. She woke up shortly before 9:30 p.m. and recounted that seven individuals were in the room: Roger, appellant, two African-American men she did not recognize, Joker, Edgar, and the large Hispanic man who was there before she fell asleep. Most of these people were huddled in a small group, looking at a phone. She overheard someone say the word "court" in the context of an address, and heard someone say, "Montgomery Village Avenue" or "East Montgomery Village Avenue." Once she was fully awake, she immediately gathered her things and left the house. As she was leaving at approximately 9:30 p.m., she noticed that the phone that had the small group's attention was displaying a map. Outside, Ms. Kuria saw a silver SUV that she had seen before, but which was not typically in the neighborhood. Within a week after the murders, Roger told Ms. Kuria, "whatever you do, don't ask me why, but whatever you do, if anyone asks you any questions, say you left my house at like 10:20, 10:30," because "if you say that, you know, it only gives me 10 minutes."

Ms. Kuria told the police that she had spoken with three individuals about the events of the night of the murders. She said that she spoke with her mother about it, "but [she] didn't tell her everything." She also spoke with an ex-boyfriend named Diego, saying, "I didn't tell him too much, but I would tell him enough to try to make sense of it." She asked Diego if he thought people at Roger's house that night might have committed the murders. Ms. Kuria also indicated that, shortly after the murders, she had spoken in greater detail about the events of June 5 with a co-worker named Jasmine.

During this second interview, both Detective Springer and Ms. Kuria acknowledged that the detectives had spoken with Ms. Bell. Indeed, Ms. Kuria confirmed that she had

4

spoken with her mother the previous evening.

Ms. Kuria revealed that she lied during the first interview because she was living with Roger's family and feared retribution.[4]

**Trial**

Appellant was arrested on June 17, 2017, and was charged with first-degree murder, conspiracy to commit murder, and other related offenses. Three other co-conspirators, Roger Garcia, Edgar Garcia-Gaona, and Rony Galicia, were also arrested. Appellant waived his right to a jury trial and proceeded to trial before the court.

During the trial, the State presented evidence that Roger Garcia was in contact with one of the victims, Shadi Najjar, through Snapchat[5] shortly before the murders, arranging to meet him at Gallery Court to purchase an extra graduation ticket. Cell tower data showed that appellant's phone and the phones of two other co-conspirators were all in the vicinity of Roger's house from 9:26 to 10:11 p.m. on June 5, 2017. The cell tower data also showed that the phones moved toward the location of Gallery Court at the time of the murders, and then moved back to Roger's house shortly thereafter. Call and text messaging history from

---

[4] Ms. Kuria's living arrangements apparently changed frequently between the date of the murders and the date of the trial. On June 5, she was living with her parents. She moved in with Roger's family on June 19, two days after Roger was arrested, and was living there at the time of the first interview. At the time of the second interview, Ms. Kuria was homeless and living out of her car. Shortly after the second interview, the Montgomery County State's Attorney's Office paid for Ms. Kuria to stay at a hotel for a few weeks, then paid the security deposit and first month's rent for an apartment for her. She was living in that apartment at the time of trial.

[5] Snapchat is a smartphone application which allows users to communicate instantly, primarily through pictures and video.

March 6 to June 5, 2017, was deleted from appellant's phone.

An eyewitness to the murders testified that she saw "an old, gray van" drive around the cul-de-sac. Immediately after the witness lost sight of the van, she heard "rapid fireworks" coming from the area where the van was traveling. Another witness who lived near the scene of the crime heard gunshots and saw what he described as either a silver or beige minivan or SUV leaving Gallery Court shortly thereafter.

Forensic specialists testified that four handguns were used during the murders. DNA found on casings at the crime scene matched Rony Galicia, who was living at Roger's house. Police found appellant's fingerprint on a box of live cartridges retrieved from Roger's house. The cartridges matched the caliber and brand of some of those used in the murders. Outside Roger's house, police found a live cartridge of a different caliber from those in the box. This cartridge had been loaded into one of the weapons used in the murders.[6]

Edgar's girlfriend, Luz DaSilva, testified that she saw Edgar alighting from appellant's silver or gray hybrid SUV at midnight on the night of the murders. None of the other co-conspirators owned a vehicle at the time. Ms. DaSilva testified that Edgar was acting nervously and watching television news reports about the murders the next day. On June 15, appellant was talking to Edgar at Edgar's house about leaving a box of bullets

---

[6] Police did not recover any of the weapons used in the murders. However, Detective Grant Lee testified that the tool marks on the cartridge found outside the house matched tool marks on a casing found at the murder scene, indicating that the cartridge had been loaded into and then removed from one of the weapons used in the murders.

there "because it was too hot outside," which Ms. DaSilva understood to have something to do with the police. During cross-examination, Ms. DaSilva testified that Edgar sold drugs out of Roger's room, using the outside entrance near where police found the single live cartridge. She also stated that appellant frequently visited Roger's house.

Ms. Kuria also testified at trial, providing a rendition of events substantially similar to those related during her second police interview. Her trial testimony differed from her second interview in the following respects: at trial, she stated that she left Roger's house at around 9:00 p.m., not 9:30 p.m.; she identified Rony Galicia as the large Hispanic man she had seen at Roger's house the day of the murders; she testified that one of the phrases she overheard was "East Village Avenue," not "Montgomery Village Avenue"; and Ms. Kuria explained that she changed her version of events between the two police interviews because she did not believe Roger was guilty during the first interview, but struggled with her conscience, and "wanted to do the right thing for once in [her] life."

Defense counsel thoroughly cross-examined Ms. Kuria, attempting to uncover a threat or deal between Ms. Kuria and the police or prosecutors that would have caused Ms. Kuria to change her description of events to a more prosecution-friendly version. Ms. Kuria denied that any such understanding existed, but admitted that the State's Attorney arranged for her to stay at a hotel, then paid a security deposit and first month's rent at an apartment because she had been living out of her car at the time of the second interview. However, Ms. Kuria testified that the initial discussions concerning these accommodations took place after the second interview. Toward the end of cross-examination, Ms. Kuria confirmed that she contacted the police after the police spoke to her mother.

7

Detective Springer testified about his interviews with Ms. Kuria, and verified that he spoke with Ms. Kuria's mother on October 10, 2017. Defense counsel declined to cross-examine Detective Springer.

The State produced evidence showing that the motive for these murders stemmed from an incident in December 2016, during which Shadi stole marijuana from appellant's then-pregnant wife and ran over her foot with his car while fleeing. In the immediate aftermath of the incident, both at the scene and at the hospital, appellant attempted to call Shadi five times. Appellant gave the police a detailed description of the driver, but did not provide Shadi's name. However, after police arrested appellant for the murders in June, he claimed that he had not witnessed the December incident and knew very little about what had happened. While she was in the hospital the day of the December 2016 incident, appellant's wife told police she did not want the robbery to be investigated. Eugene Illarionov, a friend of Shadi's, testified that Shadi told him about the incident, admitting that he stole marijuana, and "he might have run over the drug dealer's wife's foot." The State also produced evidence that, on June 10, 2017, appellant searched Google on his phone for "I kill for my family rap songs."

A recording was played during trial of a June 7 police interview of Hanan Saif, who dated Shadi from January 2017 until his murder. In the recording, Ms. Saif stated that Shadi was scared there would be retribution for the December 2016 incident. She also said that, the day Shadi died, he had texted Ms. Saif saying he was going to meet with Roger Garcia.

We shall provide additional facts as necessary.

8

**STANDARD OF REVIEW**

We review the trial court's determination as to the existence of a *Brady* violation *de novo*, *Ware v. State*, 348 Md. 19, 48 (1997), and the decision whether to grant a new trial for abuse of discretion, *Brewer v. State*, 220 Md. App. 89, 111 (2014) (citing *Argyrou v. State*, 349 Md. 587, 600 (1998)). *See also United States v. Wilson*, 624 F.3d 640, 660 n.24 (4th Cir. 2010) ("[M]otions for a new trial based on an alleged *Brady* violation are reviewed for abuse of discretion. It is an abuse of discretion for the [trial] court to commit a legal error—such as improperly determining whether there was a *Brady* violation—and that underlying legal determination is reviewed *de novo*." (citing *United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001)).

**DISCUSSION**

Appellant asserts that the trial court erred in denying his motion for a new trial based on the State's failure to disclose the interview between the police and Ms. Kuria's parents. Appellant argues that he would have used information from the parents' interview, had it been disclosed, to impeach the testimony of Ms. Kuria in two ways. First, appellant argues that the interview with Ms. Kuria's parents is evidence of the State's informal deal with Ms. Kuria not to pursue any charges relating to her lying to the police. Second, appellant claims he could have used the interview as further evidence that Ms. Kuria's version of events given to the police in the first interview was likely the most accurate account because Ms. Kuria also told her mother that she did not know who committed the murders.

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is

9

material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The Court later clarified that this rule is not absolute: "[A] rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments." *United States v. Bagley*, 473 U.S. 667, 675 n.7 (1985).

Maryland Rule 4-263(d)(6) also imposes a requirement for the prosecution to disclose:

> All material or information in any form, whether or not admissible, that tends to impeach a State's witness, including:
>
> (A) evidence of prior conduct to show the character of the witness for untruthfulness pursuant to Rule 5-608(b); [and]
>
> (B) a relationship between the State's Attorney and the witness, including the nature and circumstances of any agreement, understanding, or representation that may constitute an inducement for the cooperation or testimony of the witness.

There are three elements to a *Brady* violation: (1) whether the evidence would have been favorable to the defense at trial, (2) whether the evidence was suppressed or withheld, and (3) whether the evidence was material. *Yearby v. State*, 414 Md. 708, 717 (2010) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). We shall address these elements in turn.

### 1. Would the evidence have been favorable to the defense at trial?

Favorable evidence, in the context of a *Brady* violation, "encompasses not only exculpatory evidence, but also evidence that may be used to impeach the credibility of a

10

witness." *Conyers v. State*, 367 Md. 571, 606 (2002). "Evidence that the State has entered into an agreement with a witness, whether formally or informally, is often powerful impeachment evidence and the existence of such a 'deal' must be disclosed to the accused." *Ware*, 348 Md. at 41. The Court of Appeals has recognized the importance of disclosing this type of evidence because "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Harris v. State*, 407 Md. 503, 521 (2009) (alteration in original) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

Appellant argues that the undisclosed interview of Ms. Kuria's parents constituted evidence of an inducement for Ms. Kuria to testify in a manner acceptable to the State in order to prevent any charges being brought against her for lying to the police. During the parents' interview, the detectives impressed upon them no less than seven times that Ms. Kuria could face criminal charges for lying to the police during her previous interview, mentioned six times that they knew or strongly believed that Ms. Kuria had lied during her first interview, and insinuated six times that, if she told the truth, she would no longer be in legal trouble. The day after this interview, Ms. Kuria spoke again with Detective Springer, this time changing her version of events to the version that she would later recount at trial. During Ms. Kuria's second interview, she apologized for lying the first time and stated that she had spoken with her mother the night before, i.e., the day of the undisclosed interview. Detective Springer likewise confirmed that he and Detective

Gwynn had spoken to Ms. Kuria's mother and relayed their concern that Ms. Kuria had lied to them.

We have no difficulty concluding that the interview with Ms. Kuria's parents may have provided useful evidence to impeach Ms. Kuria. The undisclosed interview potentially shows the "nature and circumstances of . . . [an] understanding[] or representation that may constitute an inducement for the cooperation or testimony of the witness." Rule 4-263(d)(6)(B). The defense would have likely focused on the multiple times the police told Ms. Kuria's parents that Ms. Kuria could face charges for lying to the police, but that she could extricate herself from any legal trouble by telling the truth. At a minimum, the defense would be entitled to probe that issue during cross-examination.

Appellant also asserts that he could have used the undisclosed interview as evidence that Ms. Kuria's original statement to the police was truthful. He bases this argument on a statement by Ms. Kuria's mother in the interview that Ms. Kuria "said she didn't know" who committed the murders. We recognize that this statement could potentially be favorable to the defense, but is less certain to be so. As the trial court noted in its decision on the motion for new trial, "if she told her mother, I don't know who did the killing, . . . that's a truthful statement if she wasn't present to see what happened." Nevertheless, Ms. Bell's statement concerning what Ms. Kuria told her could have been useful to the defense in challenging Ms. Kuria's credibility. Thus, *Brady*'s first element is satisfied.

## 2. Was the evidence suppressed or withheld?

There is no dispute that the State did not disclose the recording of the interview with Ms. Kuria's parents until after the trial. However, in Ms. Kuria's second interview, both

12

Ms. Kuria and Detective Springer mentioned that the detectives had spoken to Ms. Bell. The State argues that the substance of the interview was therefore discoverable by appellant had he acted with due diligence. Under the circumstances of this case, we need not resolve this issue and will assume that the second *Brady* element was also satisfied.

### 3. Was the evidence material?

For the nondisclosure of the interview with Ms. Kuria's parents to amount to a violation of due process, the interview must also be material. *Yearby*, 414 Md. at 717–19. Appellant "need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles v. Whitley*, 514 U.S. 419, 434–35 (1995). Rather, he need only show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

Where, as here, the facts do not indicate that the prosecution has intentionally or knowingly presented perjured testimony relating to undisclosed evidence of an inducement to testify, "the standard for materiality . . . is whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Wilson v. State*, 363 Md. 333, 347 (2001) (internal quotation marks omitted) (quoting *Bagley*, 473 U.S. at 682).[7] "[S]trictly speaking, there is never a real

---

[7] A more stringent review standard applies where the prosecution has intentionally or knowingly presented perjured testimony: "the conviction must be set aside 'if there is any reasonable likelihood that the false testimony could have affected the judgment of'"

(continued)

13

'*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Yearby*, 414 Md. at 718 (alteration in original) (quoting *Strickler*, 527 U.S. at 281).

Materiality of suppressed impeachment evidence is determined based on several factors enumerated in *Wilson*, 363 Md. at 352. These factors include:

> the closeness of the case against the defendant and the cumulative weight of the other independent evidence of guilt; the centrality of the particular witness to the State's case; the significance of the inducement to testify; whether and to what extent the witness's credibility is already in question; and the prosecutorial emphasis on the witness's credibility in closing arguments.

*Id.* (internal citations removed).

Important to our analysis of "materiality" is that this case was tried without a jury. "The assumed proposition that judges are men [and women] of discernment, learned and experienced in the law and capable of evaluating the materiality of evidence, lies at the very core of our judicial system." *State v. Babb*, 258 Md. 547, 550 (1970). In a bench trial, the trial judge who then rules on a motion for new trial based on newly discovered evidence is in a unique position to determine the materiality of the new evidence.

Courts in other states have recognized the analytical difference between jury and bench trials in this context. In *People v. Gabriel*, 924 N.E.2d 1133 (Ill. App. Ct. 2010), the court recognized the more deferential standard of review of a denial of a motion for new

---

the fact-finder. *Harris*, 407 Md. at 522 (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). Here, because there was no indication that the State intentionally or knowingly presented perjured testimony, the "reasonable probability of a different result" standard applies. *Wilson*, 363 Md. at 347.

14

trial based on newly discovered evidence where the case was tried by the court. *Id.* at 1151–52. There, after a bench trial, the defendant moved for a new trial based on newly discovered evidence, specifically, the testimony of a co-defendant that the defendant was not present when the crime occurred. *Id.* at 1137, 1141. After holding an evidentiary hearing to consider the alleged newly discovered evidence, the trial judge concluded that a new trial was not warranted. *Id.* at 1141–42. In affirming the trial court's denial of the motion for new trial, Illinois's intermediate appellate court distinguished two Illinois Supreme Court cases that held that a new trial based on newly discovered evidence was warranted in the context of a jury trial, stating:

> However, here, the circuit court considered [the alleged newly discovered evidence] and determined that a new trial based on the newly discovered evidence was not warranted. Further, both defendants in *Molstad* and *Ortiz* were tried before juries. In the instant case, the judge who considered the newly offered evidence was the trier of fact.

*Id.* at 1151–52; *accord Lee v. State*, 186 S.W.3d 649, 660 (Tex. App. 2006) ("[T]he trial court, as the trier of fact in the case, was in the best position to determine whether this evidence would have produced a different result").

Other states have applied these principles in evaluating *Brady* claims. In *Stroik v. State*, the Delaware Supreme Court concluded: "Since the trial judge sat as both trier of fact and arbiter of law, there is no logical possibility that disclosure of the criminal histories of [two witnesses] would have altered the outcome of the case. Therefore, the evidence was not material as contemplated by *Brady* and its progeny." 671 A.2d 1335, 1340 (Del. 1996), *abrogated on other grounds by Lloyd v. State*, 152 A.3d 1266 (Del. 2016). The court in *Deville v. Commonwealth* discussed the analysis of the materiality element of a

15

*Brady* claim in the context of a non-jury trial, stating: "Under such circumstances, we need not hypothesize how a reasonable jury would likely have reacted to the new information. We know with certitude, from the factfinder himself, that the outcome of the proceeding would not have been different had the evidence been disclosed earlier." 627 S.E.2d 530, 532 (Va. App. 2006). However, the court cautioned that "a trial judge cannot foreclose appellate review by an *ipse dixit* denial of prejudice. Just as the original finding of guilt must fail if no 'rational trier of fact' could have made such a finding, so too the factual finding of no prejudice should be set aside if patently unreasonable." *Id.* (citations omitted).

We find these out-of-state authorities persuasive. While a reviewing court in Maryland must typically evaluate the *Wilson* factors to ascertain the likelihood that the undisclosed evidence would have swayed the jury as fact-finder, *Wilson*, 363 Md. at 351–52, a court trial presents a different calculus. In a court trial, if the trial judge adequately evaluates the significance of the undisclosed evidence, a reviewing court need not speculate about the importance of the undisclosed evidence to the trier of fact. Here, in ruling on appellant's motion for new trial, the trial judge stated:

> I've looked at the motions, and the reply, and the information that's been provided by both sides. I've also looked at my notes regarding the trial.
>
> And I guess one thing that I would start out by saying is that Victoria Kuria was not – no one is claiming that she was an eyewitness to this murder. . . .
>
> And, so, the fact that she said that she doesn't know who did the murder, from eyewitness ability accurate. [sic] So, I'm not sure where that gets to in terms of that information not being provided where she tells her

16

mother, if she told her mother, I don't know who did the killing, because that's a truthful statement if she wasn't present to see what happened.

Her testimony at trial was that she was in a room before the murder occurred, and she saw people congregating talking. I don't recall she even testified about what their conversation was about, other than a few phrases like Gallery Court, East Village, and she saw them looking at a map on a cell phone, and she identified who was holding it, and she identified those people that were watching it. And then she said something like I think something bad was going to happen, so I left. That's what she said.

*If that testimony was completely removed from the trial, and never occurred in this trial, this was an overwhelming case of evidence against the defendant in this case.*

. . .

. . . I think the real key here is whether or not this information would have been material to the outcome of the case. And the fact of the matter is that, during the trial, Victoria admitted that when she first talked to the police that she didn't tell them what she knew, because she was afraid, and that she said that she was not truthful to her mom.

And she was cross-examined by Defense counsel repeatedly about the lies that she previously made in her prior statements, and her statement that she was afraid to say what she knew, at the time, was completely, I felt, understandable given the fact that she was dating and/or living with one of the charged co-defendants in the case, and she felt that retribution would be brought down on her if she were to tell the police what she knew.

. . .

*But there's nothing that was disclosed during this interview of Mr. and Ms. Bell that would have changed the outcome of the case in any way.*

(Emphasis added).

From the trial judge's comments, it is clear that, even had the parents' interview been disclosed, there was no "reasonable probability of a different result." *Yearby*, 414 Md. at 718 (quoting *Kyles*, 514 U.S. at 434). Moreover, we concur with the *Deville* court's observation that a trial judge's "no prejudice" finding should only be set aside if it is

17

patently unreasonable.  Because we conclude that the court's "no prejudice" determination in this case is not patently unreasonable, we hold that the court did not abuse its discretion in denying appellant's motion for new trial.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.  COSTS TO BE PAID BY APPELLANT.**