*Jose Canales-Yanez v. State of Maryland*, No. 11, September Term, 2020

**BRADY VIOLATIONS – STANDARD OF REVIEW**
A trial court's determination as to the existence of a violation of *Brady v. Maryland*, following either a bench or jury trial, is a constitutional question subject to de novo review. The defendant bears the burden of establishing a *Brady* violation and must show that: (1) the government suppressed or withheld evidence, (2) that would have been favorable to the defense, and (3) that would have been material to the trial, meaning that there is a reasonable probability that it would have affected the verdict. In analyzing the materiality of undisclosed impeachment evidence, courts should also apply the six factors enumerated in *Wilson v. State*. Here, the trial court properly found that the undisclosed evidence was not material, as there is not a reasonable probability that it would have affected the verdict. Therefore, there was no *Brady* violation and the trial court did not abuse its discretion in denying the defendant's motion for new trial.

Circuit Court for Montgomery County
Case No. 132902C
Argued: October 29, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 11

September Term, 2020

JOSE CANALES-YANEZ

v.

STATE OF MARYLAND

Barbera, C.J.,
McDonald
Watts
Hotten
Getty
Booth
Biran

JJ.

Opinion by Barbera, C.J.

Filed: January 29, 2021

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

At 10:30 p.m. on June 5, 2017, the night before their high school graduation, Shadi Najjar and Artem Ziberov were shot and killed while sitting in Shadi's parked car. The two had been lured to Gallery Court, a cul-de-sac in Montgomery Village, Maryland, believing that they were going to meet up with Roger Garcia to sell him one of Shadi's graduation ceremony tickets. In total, upwards of thirty rounds were fired at the vehicle during this chilling and tragic double homicide.

Four individuals were charged with committing the murders: Roger Garcia, Edgar Garcia-Gaona, Rony Galicia, and Petitioner, Jose Canales-Yanez. After an eight-day bench trial, the Circuit Court for Montgomery County found Petitioner guilty of the murders, concluding that his motive to kill Shadi was that several months earlier Shadi had stolen marijuana from Petitioner's then-pregnant wife and run over her foot with his car while fleeing. The court convicted Petitioner of conspiracy to commit the first-degree murder of Shadi, two counts of first-degree murder, armed robbery, and four counts of use of a firearm in the commission of a felony.

Following the trial, but prior to sentencing, the State informed Petitioner's counsel of an interview that took place between two detectives and the mother and stepfather of one of the State's witnesses, Victoria Kuria. According to Petitioner, during that interview the detectives conveyed threats of prosecuting Ms. Kuria to her mother and stepfather that caused Ms. Kuria to meet with the police the following day and to alter her testimony regarding the events she witnessed on the night of the murders. During the late-disclosed interview, Ms. Kuria's mother also indicated to the detectives that Ms. Kuria had previously said that she did not know who had committed the murders.

Petitioner moved for a new trial on the basis of this alleged newly discovered evidence, arguing that its nondisclosure constituted a violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. At the sentencing hearing the circuit court denied the motion, finding that the evidence of the interview was not material, as it would not have affected the verdict. The circuit court then sentenced Petitioner to two consecutive life sentences, without parole, plus forty years. Petitioner appealed and the Court of Special Appeals affirmed the denial of his motion for new trial, holding that the circuit court's determination that the newly discovered evidence was immaterial was not "patently unreasonable."

We are asked to determine whether the circuit court's ruling as to the non-existence of a *Brady* violation was proper, and whether to endorse the Court of Special Appeals' newly articulated "patently unreasonable" standard of review. Although we decline to adopt the deferential standard of review put forth by the Court of Special Appeals, we affirm that court's ultimate affirmance of the circuit court's determination that the evidence of the interview was not material to the trial, and thus that there was not a *Brady* violation in this case.

## I.

### Facts and Procedural History

The State's case against Petitioner was long and complex, with testimony from thirty-five witnesses and over 400 exhibits. One of the State's witnesses at trial, Victoria Kuria, had been dating one of the other suspects, Roger Garcia, at the time of the murders.

2

Officers took Roger[1] into custody for his suspected involvement in the murders on or around June 16, 2017.  Several days later Ms. Kuria moved in with Roger's family at their trailer home after leaving her mother's and stepfather's house as a result of an argument.

*Ms. Kuria's First Interview*

Ms. Kuria first met with the police on June 29, 2017, after being taken into custody for driving without a license.  She spoke with Detective Frank Springer in a recorded interview at the police station.  Ms. Kuria explained that on the day of the murders she had gone to Roger's home after finishing her shift at work.  When she arrived at the trailer, present were Roger, his father, and a friend of Roger known as Joker.  She told Detective Springer that she had intercourse with Roger and then took a nap in his bedroom from approximately 9:30 to 10:20 p.m.  When she awoke, Roger, his father, and Joker were still in the trailer.  She left shortly thereafter to return home before her midnight curfew.  She admitted that she was under the influence of drugs that night but did not provide exact details.  Ms. Kuria repeatedly stated that she did not know anything about the murders and had not overheard anything being discussed in that regard.

Detective Springer indicated many times throughout the course of the forty-minute interview that, although he sympathized with the difficult position Ms. Kuria was in, he believed that she was lying and told her that he had "good information" that she knew something about the case.  Detective Springer repeatedly stated that he did not believe that

---

[1] Much of the trial testimony referred to the victims and alleged co-conspirators by their first names.  When warranted to avoid confusion, we will do the same throughout this opinion.

she was involved in the murders and she was not yet in any trouble, but warned her that lying to the police was a crime:

> I'm not trying to come across as threatening, but when you lie to the police, that's a crime. You can't . . . lie to the police. Because if it's a provable lie that we know that you're lying, that can be a problem . . . for you obviously. And you have a job. You know, you have a baby on the way, probably, possibly. There are things that are important for you to consider. . . . So I'm trying to stress to you that the better route to go is to be truthful, and then we can work with that. . . . You see what I'm saying? I can't impress that upon you enough.

Detective Springer indicated that he thought Ms. Kuria was lying in order to protect Roger, in part because she may have been pregnant at the time, but that by doing so she was creating a problem for herself down the road. Detective Springer also stated that it was a "pivotal moment" for her and suggested that she take a polygraph examination. At this point in the interview Ms. Kuria became visibly distressed. She declined Detective Springer's request to take a polygraph exam and asked to speak with a lawyer.

Detective Springer then explained to Ms. Kuria that she was not under arrest, but she could be brought before a grand jury where thirty people would ask her questions about what she witnessed on the night of the murders. He said that she would not be allowed to have a lawyer in the room and if she lied to the grand jury she could be charged with perjury. Detective Springer stated that there was already an outstanding subpoena for her to testify before a grand jury, but that he had declined to serve it on her because he wanted a chance to interview her one-on-one instead. He told her that based on the information that the State's attorney had, and the fact that she was not disclosing what he believed she

4

actually knew about the night of the murders, the prosecutor was likely going to reissue the subpoena.

At the end of the interview, Detective Springer asked Ms. Kuria if she had ever seen any guns in Roger's trailer; she responded that she had not. Finally, Detective Springer asked her if she knew Petitioner. She replied that she had "seen him before," but did not know him well.

*The Undisclosed Interview with the Bells*

On October 10, 2017, more than three months after Ms. Kuria's first contact with the police, Detective Springer and Detective Gwynn went to the home of Ms. Kuria's mother and stepfather, Mr. and Mrs. Bell, attempting to locate Ms. Kuria. The detectives spoke with the Bells in a recorded interview. Detective Springer stated that he thought the Bells had "spoken with the police before about this issue with like [Ms. Kuria] had a boyfriend [i.e., Roger Garcia] a little while ago," which Mrs. Bell confirmed.[2] When the detectives asked the Bells about Ms. Kuria's current living situation, Mrs. Bell indicated that Ms. Kuria had moved out of Roger's trailer, and that she may have been staying with a prior boyfriend named Mitchell at the time.

---

[2] Petitioner argues that because the State never provided him with information regarding any interactions between the Bells and the police prior to October 10, 2017, this statement indicates the possible existence of another *Brady* violation. Petitioner bears the burdens of production and persuasion with respect to his *Brady* claim. *See Yearby v. State*, 414 Md. 708, 720 (2010). He failed to produce enough evidence to substantiate the existence of any such other potential violation. In any event, that argument was not put forth below and is accordingly not preserved for review by this Court. *See* Md. Rule 8-131.

Mrs. Bell explained to the detectives that she had met with Ms. Kuria a few days prior and that she had seemed depressed and had stopped taking her medication. Mrs. Bell also told the detectives that the week before, Mitchell called her "and said Vicki was trying to kill herself or something like that. She wanted to throw herself out the window." The detectives indicated that they would try to follow up with Mitchell and confirmed with Mrs. Bell that they had the correct phone number for Ms. Kuria. The detectives also inquired about Ms. Kuria's friends and whether the Bells "had ever heard the name Ashley Foogle . . . [b]ecause [they] were told she might have a friend with that name." Mr. Bell responded that he had not.[3]

When Detective Springer stated that they were investigating the murders of Shadi Najjar and Artem Ziberov, Mr. Bell said: "[Vicki] knows about that, she knows about that. She said she knew who did it . . . ." Mr. Bell then asked Mrs. Bell if she remembered Ms. Kuria saying that. Mrs. Bell replied: "No, Vicki . . . said she didn't know" who committed the murders. Detective Springer explained that he believed Ms. Kuria had lied to him in her first interview and that she knew more than she had previously disclosed because "she felt allegiance to [Roger] and wanted to protect him." Detective Springer stated that "when you have information in a case and you lie to the police about it, that can turn into a crime

_____

[3] Ms. Foogle's name appears only once in the record. The nature of Ms. Kuria's relationship with Ms. Foogle, if any, is unknown. Ms. Foogle was never called to testify at trial, and there is no indication in the record of her involvement in this case or the underlying events. We will, however, address Petitioner's argument that the undisclosed interview with the Bells deprived him of the opportunity to question Ms. Foogle.

for you." He said that based on the other evidence in the case, including phone records, "we now know that Vicki was lying to us."

Detective Springer explained to the Bells that "now that she's no longer with [Roger], [they were] trying to reach out to her" "to kind of give her a second chance" and "see if she'll do the right thing and be truthful with us." When Mrs. Bell asked if Ms. Kuria was in trouble, Detective Springer said:

> She's not in trouble, the problem is, because she's lied to us and we can prove it now, that could be an issue for her and I'm trying to make it so that it's not an issue for her. . . . But in order for that to happen, I need her to come in and talk to me and tell me the truth.

At various points during the interview, Mr. Bell also expressed a desire that Ms. Kuria cooperate with the police and told the officers to do their job and not to give her any "breaks."

The State did not provide Petitioner with the recording or transcript of the interview with the Bells until after trial. The late disclosure of that evidence is the foundation of Petitioner's *Brady* claim and his motion for a new trial.

*Ms. Kuria's Second Interview*

On October 11, 2017, the day after the undisclosed interview with the Bells, Detective Springer and Detective Gwynn interviewed Ms. Kuria a second time. At the outset of the interview, Detective Springer again expressed sympathy for the position that Ms. Kuria was in but stated that, although she was not under arrest, it was important that she be honest and tell the detectives everything that she knew. Ms. Kuria began to cry and

7

explained why she had lied about not knowing anything regarding the murders during her first interview:

> I never thought I would ever find myself in a position where I would be lying to an officer, but in that moment I was scared out of my mind because I didn't know what to do and on top of that, at the time, I was living with [Roger's family] and just seeing how they carried themselves and, you know, making my own judgments. . . . I knew that if I were to say anything, that I would be putting my own life after this, that's the only thing that kept on going through my head is, what if they do what they did to those boys to me, too.[4]

Ms. Kuria also indicated that early on, despite her fear, she did not want to believe that Roger was capable of committing the murders.

Ms. Kuria explained that since her first interview, Roger's family had "kicked her out" of the trailer. She said that they did so because they saw her name on a discovery list indicating that she had given a written witness statement, even though she had never done so. At that point in time she became homeless and either stayed with friends or slept in her car. She also explained that she was no longer in a relationship with Roger.

Ms. Kuria stated that while she had been trying not to think about what had happened on the night of the murders, that approach had not been successful for her "in the

---

[4] As the trial judge noted, this fear of retribution may have been well-founded. During trial, the prosecution informed the judge at a bench conference that Petitioner's wife was present and was seen using her cell phone to take a picture of Ms. Kuria while she was on the stand. When the judge asked Petitioner's wife about the incident at the bench, she initially denied doing so. After the judge asked her to show counsel and the court the pictures on her phone, she admitted that she took a picture of Ms. Kuria. At a later bench conference, the prosecution informed the judge that Petitioner's wife was also overheard making threatening statements about Ms. Kuria. The judge ultimately confiscated her cell phone and banned her from the courtroom for the remainder of the trial.

past couple [of] months at all.  I've done nothing but just cry and feel empty inside and I'm not going to lie, [there have] been times [when] I've tried to commit suicide because I just . . . felt so lost I didn't know what to do."  Ms. Kuria said that she did not "mind helping [the detectives] because it's the right thing to do and honestly, I am tired of feeling like I'm dead inside because I'm carrying something so heavy with me."  At the end of the second interview, Ms. Kuria again began to cry and asked not to be involved in the case, as she feared that there would be retribution against her.  She also apologized to Detective Springer for lying to him during their first interaction.

During this second interview, Ms. Kuria provided a different account of what she witnessed on the night of the murders.  She again explained that she had gone to Roger's trailer after work.  This time she said that she smoked marijuana with Roger prior to having intercourse, and that smoking makes her "sleepy."  She then fell asleep at approximately 7:00 p.m.  She told the detectives that at that point there were four men in the room: Roger, Edgar, Joker, and a large Hispanic man she did not know.  When she awoke from her nap shortly before 9:30 p.m., Petitioner and two African American men she also did not recognize were in the room, in addition to the four men who were present when she fell asleep.  Several of the men were crowded around a cell phone.  She then heard someone say "something court" in the context of an address, and also heard "Montgomery Village Avenue," "East Montgomery Village Avenue," or "East Village Avenue."[5]

---

[5] East Village Avenue and Montgomery Village Avenue are both located near Gallery Court, where the murders took place.  When Ms. Kuria learned from the news the

9

Ms. Kuria told the detectives that she had a "sickening feeling" about whatever was happening in the trailer, so she quickly gathered her things and left as soon as she could. As she was telling Roger that she had to leave he was changing into "a blacked-out hoodie." She also saw him grab a black semiautomatic pistol, which she had not previously seen, from the nightstand next to the bed. Ms. Kuria said that on her way out she glanced over at the phone that the men were crowded around and saw that it was displaying a map. She stated that the large Hispanic man was holding the phone and "moving [the map] around to look at all the roads" as the other men looked on.

When Ms. Kuria was leaving the trailer around 9:30 p.m., she noticed a silver SUV parked outside that she had previously seen in the neighborhood but was not normally there. She explained that Roger did not respond to her text messages that night after she returned home, and that in the following days he provided conflicting accounts of what he had been doing that night after she left the trailer. Ms. Kuria stated that prior to his arrest, Roger told her "whatever you do, don't ask me why, but whatever you do, if anyone asks you any questions, say you left my house at like 10:20, 10:30," because "if you say that, you know, it only gives me 10 minutes." Ms. Kuria told the detectives that Roger gave her the impression that if she did not lie to the police for him about what she witnessed, she would be "a dead woman walking." At this point during the interview, Ms. Kuria again became emotional.

following morning where the murders occurred, she was convinced that the night before one of the statements that she had overheard was "Gallery Court."

10

The detectives questioned Ms. Kuria about whether she had confided in anyone regarding what she had witnessed that night. She told the detectives that she had spoken with her mother about Roger, "but [she] didn't tell her everything." She also confided in a former boyfriend named Diego, telling the detectives that: "I didn't tell him too much, but I would tell him enough to try to make sense of it." She told Diego that she thought the men in the trailer that night may have committed the murders.

Finally, Ms. Kuria told the detectives that prior to her first interview with Detective Springer, she had spoken with Jasmine Jones, her coworker at the time. Ms. Kuria said that she had gone through "step-by-step" what she had witnessed that night while Ms. Jones was taking notes. Ms. Kuria indicated that she had told Ms. Jones essentially the same version of events of that night that she was then recounting to the detectives. She stated that "Jasmine was the person that [she], literally, told everything to." Ms. Kuria also repeatedly told the detectives that after speaking with Ms. Jones, she was "paranoid" that she was going to be killed for confiding in Ms. Jones.

During the interview, Detective Springer acknowledged that he had previously spoken with Mrs. Bell and told her that they "wanted to give [Ms. Kuria] another chance because we've learned a whole lot more and we don't really have to do this." Ms. Kuria also indicated to the detectives that Mrs. Bell had spoken with her the night before. Mrs. Bell shared with her some of the substance of what the detectives had discussed with the Bells during their interview in relation to why Ms. Kuria had moved out of the trailer.

11

When the detectives asked how well Ms. Kuria knew Petitioner, she stated that she had seen him three or four times. She also said that she immediately recognized Petitioner upon seeing his picture posted online when he was first accused of committing the murders. This time she also admitted to having seen Petitioner take out a silver and black pistol and place it on a table in the trailer on previous occasions.

At the time of the second interview, Ms. Kuria was still homeless and living out of her car. When the detectives asked if she lived with a man named Mitchell, she responded that she did not but that she sometimes stayed with him. Shortly after the second interview, the Montgomery County State's Attorney's Office paid for Ms. Kuria to stay at a hotel for a few weeks and then paid the security deposit and first month's rent for an apartment for her.

*The Bench Trial*

When Ms. Kuria testified at trial, she recounted a version of the events of the night of the murders that was substantially the same as the one she provided in her second interview with Detectives Springer and Gwynn. Her trial testimony differed from her explanation during her second interview in that at trial she testified that she left Roger's trailer at around 9:00 p.m., not 9:30 p.m., she identified Rony Galicia as the large Hispanic man she had seen at Roger's trailer on the night of the murders,[6] and she said that she had not seen the silver vehicle that was parked outside the trailer prior to that night.

---

[6] After her second police interview, Ms. Kuria identified Rony from a set of police photographs. She testified at trial that she had learned his name after living at Roger's

12

The State asked Ms. Kuria on direct examination whether she told the truth to Detective Springer during her first interview. She answered that she did not because "[a]t the time I was in doubt and did not believe that someone I thought I knew would commit such a crime and I was scared." She also testified on re-direct that the reason she declined Detective Springer's request to take a polygraph exam during her initial interview was that she was lying at the time. When asked why she told the truth during the second interview, she responded that "I felt like I was losing my senses. I didn't feel okay with myself. I felt like I was battling a fight between myself and I wanted to do the right thing for once in my life."

During her lengthy cross-examination, defense counsel repeatedly attempted to establish that Ms. Kuria was biased towards the State based either on a threat of prosecution for lying to the police, or on some sort of deal whereby the State would not prosecute her and would drop her other outstanding driving-related charges. Defense counsel asked if she was "being paid by the prosecutors or the police office right now" or "at any time." Ms. Kuria acknowledged that the State's Attorney's Office had paid for her to live in a hotel for a period of time, and that they then paid for the security deposit and first month's rent for her apartment. However, she did not state that she was otherwise being paid or offered a benefit by the State for her testimony. Ms. Kuria also denied the existence of any

---

trailer. Following Ms. Kuria's identification of Rony, the detectives collected a DNA sample from him.

deal with the State to drop her driving-related charges, and she indicated that the arrangements for her accommodations were discussed only after her second interview.

Defense counsel also read at length from the transcript of the first interview, identifying with Ms. Kuria each statement that she made that was a lie. Ms. Kuria agreed with defense counsel that she had lied at least seventeen times to Detective Springer during her first interview. Ms. Kuria also explained on cross-examination that she was in contact with the detectives prior to the second interview after the police had spoken to her mother.

Detective Springer also testified at trial. When asked about how he had located Ms. Kuria prior to her second interview, he said that "I tried a few different ways, but eventually I found where her mother lived. I went and I spoke to her mother and asked if she could assist me in finding her." Detective Springer said that when Ms. Kuria spoke on the phone with him the next day she "was crying . . . scared . . . [and] apologetic." When asked if he had ever "during that interview or at any time speaking with her, [made] any promises to her regarding any court case," Detective Springer responded that he had not. He also denied knowledge of any details of Ms. Kuria being charged with driving under the influence. Defense counsel did not cross-examine Detective Springer.

The State also called Jasmine Jones, Ms. Kuria's former coworker. Ms. Jones testified that approximately a week after the murders—several weeks prior to Ms. Kuria's first police interview—Ms. Kuria had met with her to discuss what she had witnessed on the night of the murders. Ms. Jones stated that Ms. Kuria had called her, indicating that she was scared and wanted to come to her house to talk. When she arrived, Ms. Kuria told

14

Ms. Jones that "she was dating someone who she [thought] might be involved in the [murders]." According to Ms. Jones, Ms. Kuria was considering going to the police, but she was fearful of retribution.

Ms. Kuria told Ms. Jones that on that night, when she awoke from her nap, Roger, Edgar, and Edgar's "best friend"[7] were in the room along with some other men she did not know. She told Ms. Jones that she "heard some conversations going on that made her feel really uncomfortable." Ms. Jones also said that within ten minutes of Ms. Kuria's arrival at her house, Ms. Kuria was crying "hysterically." Ms. Jones testified that she later informed the police that she thought Ms. Kuria was in danger and asked them to contact her. Defense counsel objected to the admissibility of Ms. Jones' testimony. However, the circuit court admitted her testimony under the prior consistent statement exception to the hearsay rule. *See* Md. Rule 5-802.1(b).

Detective Paula Hamill, the co-lead investigator on the case along with Detective Springer, testified that Jasmine Jones had reached out to the police in June of 2017 and that Ms. Jones' message was relayed to her via email on June 23. Thereafter—still prior to Ms. Kuria's first interview but after she had moved into Roger's trailer—Detective Hamill attempted to contact Ms. Kuria. Detective Hamill testified that on June 24, 2017, five days before Ms. Kuria's first interview, several detectives went to the Bells' home in order to speak with Ms. Kuria. According to Detective Hamill, Ms. Kuria's stepfather said that Ms.

---

[7] Based on the record, it is possible that this refers to Petitioner. The State also proffered evidence tending to show that Edgar and Petitioner were close friends of Rony.

Kuria did not live there and that he did not know how to get in touch with her. Following that interaction, Ms. Kuria's mother called the detectives in order to provide them with more information. Finally, Detective Hamill testified on cross-examination that Ms. Kuria never received any money on behalf of the Montgomery County Police Department.

In addition to all of the testimony by and in relation to Ms. Kuria, the State introduced other circumstantial evidence inculpating Petitioner and his alleged co-conspirators, including Snapchat records showing the following. Roger became Snapchat friends with Shadi Najjar, one of the victims, on May 31, 2017. On June 5, 2017, the day of the murders, Shadi posted a picture of one of his graduation tickets on Snapchat, advertising it for sale to his Snapchat friends. Roger sent a message to Shadi at 8:16 p.m. that evening asking if the ticket was still available. Shadi responded that it was and asked where Roger wanted to meet. Roger directed him to "East Village" and Gallery Court, which is a cul-de-sac located off of East Village Avenue, but did not provide a street address. At 10:00 p.m. Shadi indicated that he was there and later said that he was parked "by a random house." At 10:25 p.m. Roger asked "what color is your whip"?[8] In the final message sent by Shadi to Roger, approximately four and a half minutes before the murders, Shadi responded that his car was blue.

The State also introduced cell tower data showing that on the night of June 5, 2017, Petitioner traveled from the area of his parent's house towards Roger's trailer between 9:00 and 9:30 p.m. The cell tower data also showed that Petitioner, Edgar, and Roger were in

---

[8] There was testimony at trial that "whip" is often used in relation to a vehicle.

the vicinity of the trailer prior to 10 p.m. that night. At 10:11 and 10:22 p.m., Petitioner was identified as moving east of the trailer towards Gallery Court. At approximately 10:32 p.m., two minutes after the murders were committed, Roger was located in the vicinity of Gallery Court. Finally, the data showed that Petitioner was back at or near the trailer by 10:44 p.m.

A resident of Gallery Court who lived close to where Shadi's car was parked testified that he heard what sounded like firecrackers at approximately 10:30 p.m. on the night of the murders. The resident had security camera footage from that night, which the State played at trial, wherein a hail of gunfire can be heard starting two seconds before 10:30 p.m. and lasting for approximately seven seconds. A neighbor from an adjoining street testified that he heard multiple gunshots and approximately two minutes later saw a silver or beige minivan or SUV "rushing" through Gallery Court. He said that the driver had black hair and may have been Hispanic.

Officers recovered at least thirty shell casings from the crime scene. The casings were from bullets of .40, .45, and 9-millimeter calibers. The State's expert in tool mark identification, Detective Grant Lee, analyzed the casings in order to determine which casings had been fired from the same weapons. Based on Detective Lee's testimony, the casings were fired from one .40 caliber gun, one .45 caliber gun, and either one or two 9-millimeter guns. He identified the .40 caliber casings as Smith and Wesson, Blazer Brass brand. The State's DNA analyst also identified Rony's DNA on some of the .45 caliber shell casings found at the scene.

17

During their investigation, officers searched the residences of the four suspected co-conspirators and recovered ammunition and other firearm paraphernalia, but never located any weapons. Detectives recovered a gunlock from Petitioner's residence. The officers who searched Roger's residence found an empty handgun magazine and a box of Winchester .40 caliber Smith and Wesson cartridges inside the trailer, in addition to a single live round recovered outside of the trailer. Detective Lee examined the live round and testified that it was a .380 caliber round that had been cycled through one of the 9-millimeter weapons used at the crime scene—meaning that it had been loaded into the gun and then unloaded. He explained that a 9-millimeter handgun is likely capable of firing a single .380 caliber round, but that after one round it would likely malfunction.

Luz DaSilva, a former girlfriend of Edgar Garcia-Gaona, one of the four suspects, also testified on behalf of the State. She explained that she lived with Edgar in June of 2017. She testified that, at that time, Roger, Rony, and Edgar did not have vehicles, but Petitioner owned a vehicle which she confirmed to be the silver Saturn Vue depicted in several of the State's exhibits. Ms. DaSilva testified that around midnight on June 5, 2017, she saw Edgar exiting Petitioner's car outside their home. The next day Edgar was acting "jittery" and "weird" and became "nervous" as he was watching news reports on the murders.

Ms. DaSilva also testified that she later observed Petitioner hand over a box of bullets to Edgar while he was visiting, saying that "it was too hot outside." Ms. DaSilva understood this statement to relate to the police. She said that the bullets were placed

behind the television at their residence. Ms. DaSilva then called the police because she "wanted to do the right thing." Officers later recovered a box of .40 caliber Blazer Brass brand ammunition from behind a television at Edgar's residence. Officers were able to lift what was later determined to be Petitioner's fingerprint from that box of ammunition.

Ms. DaSilva also testified that she had previously seen Edgar with a Springfield brand 9-millimeter handgun. She said that he had purchased the gun in May or June of 2017, prior to the murders. On cross-examination she correctly identified that type of weapon when shown a photograph. Finally, Ms. DaSilva testified that Edgar often sold drugs from outside of Roger's trailer and that Petitioner was at the trailer "all the time basically."

The State also produced evidence regarding an incident in December of 2016 during which Shadi allegedly stole marijuana from Petitioner's wife and ran over her foot with his car. The body camera footage of several responding officers shows Petitioner on the scene. Petitioner provided one of the officers with a description of the driver of the vehicle that tended to match Shadi, as well as a description of the vehicle tending to match Shadi's car, but did not provide the officers with Shadi's name. Petitioner said that he was able to see the driver from inside the house he was visiting at the time. While at the hospital, Petitioner's wife indicated to a detective that she did not want the police to perform an investigation. The State further showed that immediately following the incident, Petitioner attempted to call Shadi's cell phone six times. Shadi's phone records also showed that he was located at the scene at the time of the incident.

In June of 2017, Detective Hamill interviewed Petitioner upon being taken into custody for his suspected involvement in the murders of Shadi and Artem. When Detective Hamill questioned Petitioner about the December 2016 incident he repeatedly denied knowledge of any details, saying that his wife "just had an accident, that's all I know." Petitioner also denied being in the area at the time and said that he only found out about it when his wife called him while he was at work.

The State also called Eugene Illarionov, one of Shadi's friends. Mr. Illarionov testified that several months before the murders Shadi told him that he had stolen some marijuana and "might have run over the drug dealer's wife's foot." During the investigation of the murders, the State also interviewed Shadi's girlfriend, Hanan Saif. In a recording of that interview, played at trial at the request of Petitioner's counsel, Ms. Saif describes an incident that Shadi had told her about in which he stole marijuana from a drug dealer's "girlfriend." She said that he had expressed fear of retribution following the incident. Ms. Saif also told the detectives that prior to 10 p.m. on the night of the murders, Shadi had texted her saying that he was going to sell a graduation ticket to Roger Garcia.

The State also produced evidence recovered from Petitioner's cell phone, including a photograph of a silver and black pistol that was taken on May 23, 2017, several weeks prior to the murders. At 5:55 a.m. on the morning following the murders, internet browsing history records show that Petitioner began viewing news articles reporting on the murders, which he continued to do over the course of the next few days. He also searched for Shadi's full name five times between 4:40 p.m. on June 6, 2017 and 12:38 a.m. the next day. Then,

on June 10, Petitioner searched for "[I] kill for my family rap songs." Finally, the State showed that Petitioner had deleted his call and text message history from prior to June 5, 2017.

The defense called three witnesses in total, with one testifying out of order during the State's case. The State did not offer a rebuttal case. During closing argument, the State focused largely on the circumstantial and forensic evidence presented at trial in arguing that Petitioner and his alleged co-conspirators had committed the murders. The entirety of the prosecutor's discussion of Ms. Kuria's testimony was as follows:

> And [the cell tower and Snapchat record evidence is] consistent with what Victoria [is] telling us about then she sees these four plus two other people that we don't know who they are, standing around a phone. And she hears East Village and Court. And what do we have after [Petitioner] has arrived at 9:26 at the trailer? We have [in Roger's Snapchat messages to Shadi] East Village at 9:37 and we've got [Gallery] Court at 9:46. They're in this [S]napchat conversation.
>
> So, she's actually hearing the words of the planning that go towards where they're going to lure these guys to.
>
> * * *
>
> And Victoria sees a gray SUVish type car parked in the trailer that night.
>
> And that brings me to Victoria. She sees that car. She sees -- she hears the conversation she hears. But also, what's really important about her testimony is she sees a gun that night that she's never seen before, and she also says that she [has] seen the defendant with a gun. And she describes it as a black and silver gun. And what happens to be a black and silver gun, but this photograph that we see that's on the defendant's cell phone taken in Detective Miglianti's opinion, on May 23rd.
>
> * * *

21

So, this is all -- all of these pieces of evidence are consistent with the defendant having a gun on May 23rd that's silver and black. The same description given by Victoria and he takes a picture of it that's then erased from his phone.

In rendering the verdict, the court credited Ms. Kuria's trial testimony. The court noted that she had "a very strong motive . . . not to say anything" based upon her "personal safety," and found that she did not provide her testimony for financial gain. The court also credited and relied upon the testimony of Ms. DaSilva, Edgar's former girlfriend, and found that the circumstantial evidence corroborated both of their stories and indicated that Petitioner had planned to kill Shadi in revenge for the incident with his wife.

The court found that on the night of the murders, Petitioner, Roger, Edgar, and Rony lured Shadi to Gallery Court in Montgomery Village, ostensibly to sell a graduation ticket to Roger. Once Shadi was there, the four men traveled from Roger's trailer to that location. The men drove past Shadi's car, with Artem Ziberov, the second murder victim, clearly visible in the front seat. The men turned around at the cul-de-sac and drove back towards Shadi's vehicle, providing enough time for them to premeditate the murder of Artem. The four men surrounded Shadi's car and fired at least thirty rounds at the decedents, with Petitioner firing three .40 caliber rounds into Shadi's face and neck from point blank range. Artem was also shot ten times.

The court further found that Petitioner then took Shadi's phone, which was never recovered, from inside the car in order to erase the evidence of the conversations from that night. Following the murders, the four men disposed of the weapons and Petitioner erased information from his phone and relocated bullets from his home to Edgar's residence in

22

order to hide that evidence from the police. Finally, the court found that Petitioner's search for "[I] kill for my family rap songs" "says it all about this defendant's motive, intent, and actions on June 5th, 2017."

The court then convicted Petitioner of two counts of first-degree murder, conspiracy to commit first-degree murder, armed robbery, and four counts of use of a firearm in the commission of a felony.

*The Motion for New Trial and Sentencing Hearing*

After the bench trial but prior to the sentencing hearing, the State informed defense counsel of the recording of the interview with the Bells on the day prior to Ms. Kuria's second interview. Petitioner, by way of new counsel, filed a motion for a new trial based on that newly discovered evidence.

Petitioner argued that the recording revealed that Ms. Kuria had told her mother that she did not know who committed the murders, tending to corroborate her statements made during her first interview with the police. Petitioner also argued that the timing of the threats conveyed to the Bells was compelling because Ms. Kuria came in for the second interview the very next day. Petitioner's counsel asked the court to draw an inference that the Bells conveyed a threat to Ms. Kuria on behalf of the police, but counsel admitted to the court that the interview only served as circumstantial evidence of the possible existence of such a threat or an agreement not to prosecute her in exchange for favorable testimony.

The court considered the motion for new trial at the sentencing hearing.[9]  The court concluded that the recording of the detectives' interview with the Bells did not present any new relevant information and that it was cumulative at best.  The court noted that it was established at trial that the police had met with Ms. Kuria's mother prior to her second interview, and Detective Springer made similar threats of prosecution for lying to the police to Ms. Kuria during her first interview.  The court did not find that the transcript of the interview with the Bells revealed any express threat of prosecution or a deal in exchange for Ms. Kuria to testify in a biased manner towards the State.  The court also found that if Ms. Kuria had told her mother that she did not know who had committed the murders, that likely would have been true, given that Ms. Kuria was not alleged to be at the scene of the crime.

---

[9] At the hearing, Petitioner's new counsel offered an affidavit signed by Petitioner's lead trial counsel the day before stating that had she known about the undisclosed interview prior to trial, she would not have advised Petitioner to waive a jury trial.  The court accepted the affidavit as an exhibit with the comment that the court would "listen to both sides about whether or not it's relevant to the issue of materiality."  Petitioner's new counsel only mentioned the affidavit in closing and stated that the undisclosed interview of the Bells deprived the defense of the necessary "tools in their toolbox to put up a good defense," including "the decision about whether to go with a judge trial, or [a] jury trial."  There was no further mention from either party or the court concerning the substance of the hypothetical advice to Petitioner to proceed with a jury trial.  On appeal to the Court of Special Appeals, Petitioner's counsel did not raise, much less argue, the notion that trial counsel's hypothetical advice was grist for a *Brady* claim.  Petitioner then retained new counsel for representation before this Court.  Much like the hearing on the motion for new trial, counsel briefly referenced, but did not otherwise argue, that the nondisclosure of the interview with the Bells prevented trial counsel from advising Petitioner to proceed with a jury trial.  Given that throughout the post-trial activity in this case Petitioner has devoted little to no written or oral argument on this hypothetical advice, we can detect no reason to entertain the issue.

The court further noted that Jasmine Jones' testimony established that Ms. Kuria had made a prior consistent statement, and thereby undermined Petitioner's argument that the interview with the Bells provided Ms. Kuria with a new motive to fabricate a different version of the events she witnessed that night. The court also credited Ms. Kuria's testimony that the reason that she lied to Detective Springer during the first interview was that she was in a relationship with Roger and living with his family at the time, and she feared "retribution would be brought down on her if she were to tell the police what she knew." The court also found that even if it were to disregard all of Ms. Kuria's testimony, there would still be "an overwhelming case of evidence against the defendant." The court then denied the motion, concluding that the recording was not material as it would not have affected the outcome of the trial. After denying the motion, the court heard several statements from family and friends of the victims, and proceeded to sentencing. The court then sentenced Petitioner to two consecutive life terms, plus forty years, without the possibility of parole.

*Proceedings in the Court of Special Appeals*

Petitioner appealed the denial of his motion for new trial to the Court of Special Appeals, which affirmed the circuit court's ruling in a reported opinion. *Canales-Yanez v. State*, 244 Md. App. 285 (2020). The Court of Special Appeals gave considerable weight to the fact that Petitioner elected a bench trial rather than a jury trial. *Id.* at 300–04. The court reasoned that, because in this case the trial judge had acted as the factfinder, the judge was uniquely well-situated in ruling on the motion for new trial and determining whether

25

the newly discovered evidence would have affected his guilty verdict. *Id.* at 300. The

Court of Special Appeals cited to several other states that have adopted a more deferential

standard of review of denials of motions for new trial following bench trials. *Id.* at 300–

02. Finding these out-of-state authorities to be persuasive, the court adopted a new

standard of review in Maryland for motions for new trial following bench trials under

which "a trial judge's 'no prejudice' finding should only be set aside if it is patently

unreasonable." *Id.* at 304. The Court of Special Appeals determined that the circuit court's

ruling in this case, that the newly discovered evidence would not have altered the verdict,

was not patently unreasonable. *Id.* Therefore, it upheld the circuit court's denial of

Petitioner's motion for new trial. *Id.*

We granted certiorari to determine the proper standard of review of a trial court's

determination, following a bench trial, as to the existence of a *Brady* violation, and whether

the circuit court's finding that there was no such violation in this case was appropriate.[10]

---

[10] Petitioner styled the questions as follows:

> 1. When a *Brady* violation occurs during a bench trial, is the test for
> materiality satisfied simply by the judge's determination that his verdict
> would not have changed had the evidence not been suppressed unless such a
> conclusion would be patently unreasonable, without giving due
> consideration to the effect of the suppression of evidence on the defense['s]
> case preparation and trial strategy?
> 2. Did the Court of Special Appeals err in finding that the *Brady*
> violation did not undermine confidence in the verdict?

The phrasing of both questions presupposes that a *Brady* violation has occurred, but
the existence of a *Brady* violation is only determined after the trial court finds, inter alia,
that the suppressed evidence was material. *See Strickler v. Greene*, 527 U.S. 263, 281
(1999). Given that the circuit court here found that the evidence was not material, it

## II.

### Standard of Review

We review a trial court's denial of a motion for new trial based on newly discovered evidence for abuse of discretion. *Argyrou v. State*, 349 Md. 587, 600 (1998). However, this Court held in *Ware v. State* that we review de novo a trial court's determination as to the existence *vel non* of a *Brady* violation, as it presents a constitutional issue. *See Ware v. State*, 348 Md. 19, 48 (1997). The de novo standard announced in *Ware* does not turn on the fact that *Ware* involved a jury trial. The rule applies with equal force where the motion for new trial follows a bench trial. Thus, the "patently unreasonable" standard espoused by the Court of Special Appeals provides improper deference to the trial court, and we decline to adopt it. Although several of our sister states allow greater deference to trial courts in cases involving bench trials, *e.g.*, *Deville v. Commonwealth*, 627 S.E.2d 530, 532 (Va. Ct. App. 2006), we reaffirm our precedent establishing the propriety of de novo review in all cases as to trial court findings in relation to alleged *Brady* violations.

## III.

### Discussion

*The Parties' Contentions*

According to Petitioner, the undisclosed police interview with the Bells creates an inference that the Bells communicated a threat to Ms. Kuria, on behalf of the detectives,

---

necessarily also found that there was not a *Brady* violation. We affirm the circuit court's ruling in both respects.

that she could be prosecuted for lying to the police. In turn, this threat induced Ms. Kuria to change her testimony from the first interview in a manner that was beneficial to the prosecution. Petitioner argues that this establishes bias towards the State, created either through this threat or through a subsequent bargain not to prosecute Ms. Kuria and drop her other outstanding charges, in exchange for favorable testimony. Petitioner contends that evidence of bias is particularly powerful impeachment evidence, and thus the interview with the Bells was critical information that the State should have disclosed to him prior to trial. Petitioner also claims that had he known about the interview prior to trial, he would have altered his trial strategy in several ways. Petitioner thus argues that the failure to disclose this evidence constituted a violation of *Brady v. Maryland*, entitling him to a new trial.

The State responds that the undisclosed evidence is merely cumulative of the other evidence of Ms. Kuria's alleged bias towards the State and her potential lack of credibility. The State further contends that Petitioner failed to meet his burden of "closing the loop" and affirmatively establishing the existence of a threat to Ms. Kuria or a deal between the State and Ms. Kuria. Instead, Petitioner merely asked the circuit court, and now similarly asks this Court, to infer such a threat or deal based on what the detectives said to the Bells during the undisclosed interview. Moreover, the State takes issue with Petitioner's contention that Ms. Kuria was the key witness on behalf of the State, and points to the substantial amount of other evidence the prosecution proffered at trial that not only corroborated Ms. Kuria's testimony, but independently established Petitioner's guilt.

Finally, the State disputes whether the interview likely would have impacted Petitioner's defense strategy in the ways in which Petitioner claims. The State therefore contends that the undisclosed evidence of the interview of the Bells was not material and the nondisclosure did not run afoul of the dictates of *Brady*.

*Analysis*

"*Brady v. Maryland* and its progeny guarantee to a criminal defendant who stands trial the right to receive material exculpatory and impeachment evidence in the possession of the State." *Byrd v. State*, 471 Md. 359, 372 (2020) (citing *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972)). Evidence of bias towards one party or the other, as Petitioner contends the interview with the Bells establishes in the case *sub judice*, can constitute particularly impactful impeachment evidence under the right circumstances. *See Ware*, 348 Md. at 50 ("Evidence of agreements or deals with witnesses often provides powerful impeachment evidence against a witness and enables a defendant to attack the motive or bias of a witness who might otherwise appear to have no motive to falsify or color his testimony.") (citing *Giglio*, 405 U.S. at 154–55) (other citation omitted).

In order to establish that the State has violated his due process rights under *Brady v. Maryland*, Petitioner must establish: "(1) that the prosecutor suppressed or withheld evidence that is (2) favorable to the defense—either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness—and (3) that the suppressed evidence is material." *Ware*, 348 Md. at 38 (citations omitted).

At issue here is whether the evidence of the interview with the Bells was material.[11]  The

Supreme Court has held that "evidence is material only if there is a reasonable probability

that, had the evidence been disclosed to the defense, the result of the proceeding would

have been different.  A 'reasonable probability' is a probability sufficient to undermine

confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).  This Court

has interpreted a "reasonable probability" within this context as meaning a substantial

possibility.  *See Yearby v. State*, 414 Md. 708, 719 (2010) (citing *State v. Thomas*, 325 Md.

160, 190 (1992); *Bowers v. State*, 320 Md. 416, 426–27 (1990)).[12]

In *Wilson v. State*, this Court also identified several important factors in assessing

materiality within the context of suppressed impeachment evidence:

> [1] the specificity of the defendant's request for disclosure of materials; [2]
> the closeness of the case against the defendant and the cumulative weight of
> the other independent evidence of guilt; [3] the centrality of the particular
> witness to the State's case; [4] the significance of the inducement to testify;
> [5] whether and to what extent the witness's credibility is already in question;
> and [6] the prosecutorial emphasis on the witness's credibility in closing
> arguments.

---

[11] The Court of Special Appeals determined that Petitioner had established that the evidence would have been favorable to him and assumed without deciding that it had been suppressed or withheld.  *Canales-Yanez*, 244 Md. App. at 298–99.  Given our holding that the evidence was not material, we need not reach those two remaining elements.

[12] The State relies instead upon the standard articulated in Maryland Rule 4-331(c), governing motions for new trial on the basis of newly discovered evidence.  However, as Petitioner has put forth a constitutional claim pursuant to *Brady*, we evaluate the newly discovered evidence under that standard.  *See Diallo v. State*, 413 Md. 678, 702–15 (2010) (analyzing the petitioner's claim under *Brady*'s standard, notwithstanding that it was raised in the context of a Rule 4-331 motion for new trial).

*Wilson v. State*, 363 Md. 333, 352 (2001) (internal citations omitted). "Some of those considerations may point in one direction, some in another. The ultimate determination of materiality must arise from a composite, an amalgam, of them." *Harris v. State*, 407 Md. 503, 524 (2009).

Based upon *Brady*'s materiality standard, and the *Wilson* factors, we affirm the circuit court's ruling that the suppressed evidence was not material, as there is not a reasonable probability (or, put otherwise, a substantial possibility) that it would have altered the outcome of the trial. However, we do not cabin this affirmance to the sole ground that the trial judge indicated that the other circumstantial evidence presented by the State at trial was overwhelming. Rather, after review of the *Wilson* factors, as well as consideration of the potential impacts on defense counsel's trial strategy, we find that there is not a reasonable probability that the suppressed evidence would have had an effect on the conviction of Petitioner.

## A. The *Wilson* Factors

As an initial matter, the record before us is silent as to what material Petitioner requested from the State during discovery, so the first *Wilson* factor is unavailing in this case. As Petitioner bears the burden on his *Brady* claim, the inapplicability of the first factor does not weigh in his favor. We next consider together the second and third *Wilson* factors. Notwithstanding Petitioner's claims to the contrary, Ms. Kuria's testimony was not central to the State's theory of the case. As discussed above, she was one of thirty-five witnesses called by the State, and there was significant circumstantial and forensic

31

evidence linking Petitioner and his co-conspirators to the crime that was not dependent upon Ms. Kuria's testimony. Additionally, given the cumulative weight of the State's other evidence, this was not a close case against Petitioner. Furthermore, the State placed only minimal weight on Ms. Kuria's testimony during closing argument. The prosecutor merely stated that it was consistent with the other evidence proffered and noted that Ms. Kuria said she saw a pistol at the trailer on the night of the murders that she had not seen before. Notably, that pistol was not the weapon the State accused Petitioner of using in connection with the murders.

Thus, on its face this case is unlike others where we have found undisclosed impeachment evidence to be material where the witness at issue served a crucial role in linking the defendant to the crime or in establishing a necessary element of the crime or the sentence. *See Wilson*, 363 Md. at 353 ("In general, impeachment evidence has been found to be material where the witness at issue 'supplied the only evidence linking the defendant(s) to the crime,' . . . or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case.") (citations omitted); *Harris*, 407 Md. at 524 (finding the undisclosed evidence to be material where the impeached witness provided most of the incriminating evidence, including the only direct evidence of what occurred at the scene of the crime, and the State's case rested largely on the witness' credibility); *Conyers v. State*, 367 Md. 571, 612 (2002) (finding the undisclosed evidence to be material where the impeached witness was the key witness establishing the

defendant's principalship in the murder—a necessary component of the death sentence the defendant received).

Here, by contrast, Ms. Kuria's testimony was not central to the State's case in linking Petitioner to the murders and, given the overwhelming cumulative weight of the other incriminating evidence, Petitioner's case was not a close one. Therefore, the second and third *Wilson* factors weigh against materiality.

We next consider the fourth *Wilson* factor—the significance of Ms. Kuria's inducement to testify based upon the undisclosed interview. It is possible that after Detectives Springer and Gwynn met with the Bells, one or both of the Bells conveyed to Ms. Kuria that the police were threatening her with prosecution for lying during her first interview. This set of facts would tend to support the fourth *Wilson* factor weighing in favor of materiality. Petitioner also argues that if that did occur, it would help to explain why Ms. Kuria was crying and was so apologetic when she spoke on the phone with Detective Springer prior to her second interview.

We agree with Petitioner that it is reasonable to infer that the interview with the Bells was at least a motivating factor as to why Ms. Kuria met with the police the next day. However, based on the record it is also plausible, along with myriad other possibilities, that Ms. Kuria was crying and apologetic and changed her story during the second interview not because of a threat or deal, but for all of the reasons that she provided during that interview and at trial—reasons credited by the circuit court in rendering its verdict as well as denying the motion for new trial. As such, Petitioner did not establish that his proffered

version of events tending to establish bias towards the State actually occurred, as was his burden. *See Yearby*, 414 Md. at 720.[13]

Moreover, the threats of prosecution during the first interview were already established in the record—thereby lessening the relative significance of any possible inducement as communicated solely by the Bells. Thus, even if Petitioner's alleged version of the conversation between the Bells and Ms. Kuria were substantially accurate, it would not provide a new motive for Ms. Kuria's supposed fabrication of what she witnessed on the night of the murders. *See Conyers*, 367 Md. at 616–17 (Cathell, J., dissenting) ("The purpose of the *Brady* holding (as applied in the impeachment context) is to insure that the [factfinder] is made aware of the motive for fabrication on the part of the witness, not to mandate that every nuance of the process from which the motive to fabricate originates be remembered and/or disclosed."). Therefore, the fourth *Wilson* factor does not weigh in favor of Petitioner, and is at best neutral.

We turn next to the fifth *Wilson* factor—the extent to which Ms. Kuria was already impeached. On cross-examination of Ms. Kuria, defense counsel brought out that the

---

[13] We do not hereby suggest that a defendant alleging a *Brady* violation must affirmatively establish, to the exclusion of all other possibilities, that a threat or deal caused a witness to provide biased testimony. Here however, Petitioner's argument rests on multiple layers of inferences. First, Petitioner asks us to infer that the Bells told Ms. Kuria that she should meet with the police and change her story if she wanted to avoid prosecution. Second, Petitioner asks us to infer that Ms. Kuria then lied to the police out of fear of prosecution, and in a manner that was conveniently consistent with the State's other evidence against Petitioner. When viewed in light of the rest of Ms. Kuria's testimony, and in conjunction with the remainder of the State's case, these inferences are not strong enough to satisfy Petitioner's burden.

34

State's Attorney's Office had paid for a hotel and the security deposit and first month's rent for an apartment for her, tending to show the possibility for bias. Furthermore, Detective Springer repeatedly threatened Ms. Kuria with prosecution during her first interview, and Ms. Kuria admitted on the stand that she had lied to the police during that interview at least seventeen different times. Thus, the fifth factor weighs strongly against a finding that the undisclosed evidence was material.

The potential for Ms. Kuria's bias in favor of the State was laid bare on cross-examination, and the newly discovered evidence of the interview with the Bells does not change that fact. At best, it creates an inference that further substantiates defense counsel's theory that Ms. Kuria fabricated her testimony in acquiescence to the State—a theory which the circuit court apparently rejected. However, it is clear from a review of the totality of the State's case that whatever the undisclosed evidence does to lend some level of credence to that theory, it does nothing to undermine confidence in the verdict.

Finally, the prosecutor never discussed Ms. Kuria's credibility during her closing argument, so the sixth *Wilson* factor also weighs against a finding of materiality. On balance then, the *Wilson* factors weigh firmly against materiality and indicate that the pretrial disclosure of the recording of the interview of the Bells would not have had a reasonable probability of affecting the outcome of the trial.

We also note, as did the circuit court, that the interview with the Bells revealed relatively little new information, material or otherwise. It was established during Ms. Kuria's second interview and at trial that Detectives Springer and Gwynn had met with

Mrs. Bell the day prior to Ms. Kuria's second interview. Thus, whether or not the timing of the interview with the Bells was critical, as Petitioner contends, that information was available to Petitioner prior to trial. Additionally, while the recording of the interview revealed for the first time that the detectives indicated *to the Bells* that Ms. Kuria could be prosecuted for lying, Detective Springer had made that fact abundantly clear to Ms. Kuria during her first interview. Thus, even if the Bells did in fact convey that threat to Ms. Kuria, as Petitioner asks us to infer, that was not new information to her and did not constitute a new motive to revise her testimony. Finally, as discussed by the circuit court, the fact that Ms. Kuria may have told her mother that she did not know who committed the murders is consistent with the fact that at no point did Ms. Kuria or anyone else suggest that she was present at Gallery Court when the murders were committed. It would also be consistent with Ms. Kuria's statement during her second interview that she spoke with Mrs. Bell about Roger, "but [she] didn't tell her everything."

## B. Purported Effects on Petitioner's Trial Strategy

Petitioner also relies upon precedent suggesting that in determining the possible effect of undisclosed evidence on a verdict, a reviewing court should also consider the likely impacts on the defense's trial strategy. Petitioner principally relies upon the Supreme Court's decision in *United States v. Bagley*. There, in the context of a prosecutor's failure to provide material that would have been responsive to a specific request by the defense, the Court stated:

> [T]he reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or

36

presentation of the defendant's case. The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response.

*Bagley*, 473 U.S. at 683.[14] The Court in *Bagley* explained that the failure by the prosecution to respond to a specific request is particularly prejudicial to the defense because it implies that such evidence does not exist. 473 U.S. at 682–83. We note that Petitioner has not identified a specific request for information made to the State which would encompass the interview with the Bells. However, for the sake of argument, we will assume that such a request was made, or at least that such a deficiency would not be fatal to Petitioner's claim.

Petitioner argues that if he had known about the recording of the interview with the Bells, he would have altered his trial strategy in several ways. Petitioner first contends that the suppression of the interview with the Bells deprived him of the opportunity to question the Bells. He also argues that it prevented him from questioning Ms. Kuria's prior boyfriend, Mitchell, as well as Ashley Foogle—both of whom were discussed during the interview.[15]

---

[14] *See also Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1353 (11th Cir. 2011) ("In determining the impact of the State's action in suppressing favorable evidence, courts should consider how the defense's knowledge of the withheld information would have impacted not just the evidence presented at trial, but also the strategies, tactics, and defenses that the defense could have developed and presented to the trier of fact.").

[15] Based upon the record before us, it appears that Petitioner did not preserve these arguments in relation to Ms. Foogle and Mitchell.

Even assuming that merely alleging that the defense was deprived of questioning witnesses without actually showing a court what information they would have provided could alone satisfy the standard for materiality, it is difficult to see how any of these alleged changes to Petitioner's defense could have strengthened his ability to impeach Ms. Kuria and thereby potentially alter the verdict. *See United States v. Bowie*, 198 F.3d 905, 911 (D.C. Cir. 1999) ("When the undisclosed *Brady* material consists of impeachment evidence, a court seeking to determine the probable impact of the violation must form some idea about how effectively the evidence could have been used in cross-examination."). For example, during the interview with the Bells, the detectives merely suggested that Ms. Foogle might have been a friend of Ms. Kuria. At no point did Ms. Kuria indicate that she had spoken with Ms. Foogle about what she witnessed on the night of the murders, or even acknowledge that she knew Ms. Foogle for that matter. Thus, it is unclear on the record before us how questioning her could go to anything aside from Ms. Kuria's general credibility. As previously discussed, Ms. Kuria was already heavily impeached.

We also question Petitioner's claim that the undisclosed interview deprived him of the opportunity to question the Bells and Mitchell. It was clear from the transcript of Ms. Kuria's second interview that the police had spoken with Mrs. Bell prior to the second interview. Therefore, defense counsel could have questioned Mrs. Bell and discovered that Mr. Bell was also involved in the conversation, to the extent that was relevant. Ms. Kuria also discussed Mitchell, her previous boyfriend, during her second interview, and she admitted to staying with him for a time after the murders. Therefore, the defense had

38

sufficient information to question both Mitchell and the Bells prior to trial regardless of the undisclosed evidence.

Finally, Petitioner argues that the call that Mitchell made to Mrs. Bell about Ms. Kuria wanting to "throw herself out the window" could have been used as evidence of consciousness of guilt. However, Ms. Kuria discussed her state of mind on the stand, and in the second interview she indicated to the detectives that she had attempted to commit suicide several times. Furthermore, as Ms. Kuria was not alleged to be a co-conspirator, it is unclear how her suicidal thoughts could be relevant for consciousness of guilt. The only relevant crime of which Ms. Kuria could have been guilty at the time Mitchell made that call would have been lying to the police during her first interview, *see* Md. Crim. Law § 9-501, which undermines Petitioner's argument that it was Ms. Kuria's story during the first interview that should be credited. Therefore, none of the alleged effects on Petitioner's trial strategy undermine confidence in the verdict.

## IV.

### Conclusion

Based upon our analysis of the *Wilson* factors, and consideration of the likely effects on Petitioner's defense strategy, we hold that the undisclosed evidence of the interview with the Bells was not material to Petitioner's case. It was almost entirely cumulative of defense counsel's theory at trial that Ms. Kuria was biased towards the prosecution. Moreover, in light of the overwhelming other independent evidence of Petitioner's guilt, Ms. Kuria's testimony was not central to the State's case against Petitioner, and it was not

a close case. Defense counsel relied on Ms. Kuria's testimony to a minimal extent during closing argument and did not discuss her credibility. Although Petitioner has asked this Court to draw inferences about what the Bells may have conveyed to Ms. Kuria following their interview with the police, and then to infer how that may have affected Ms. Kuria's testimony, this is simply insufficient to satisfy his burdens of production and persuasion in order to establish his entitlement to the relief he seeks.

In sum, most of the *Wilson* factors weigh against a finding of materiality, and Petitioner has not established that any weigh in his favor. Additionally, the undisclosed evidence did not meaningfully hamper Petitioner's trial strategy. It follows that there is not a reasonable probability that the undisclosed evidence would have affected Petitioner's guilty verdict. We thus hold that the nondisclosure of the interview with the Bells did not constitute a violation of *Brady v. Maryland*. As there was no *Brady* violation, the trial court did not abuse its discretion in denying Petitioner a new trial. Though we decline to endorse the "patently unreasonable" standard of review adopted below, we affirm the judgment of the Court of Special Appeals affirming the circuit court's denial of Petitioner's motion for new trial.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.**